IN RE INTEREST OF A.M.K., A CHILD UNDER 18 YEARS OF AGE.
STATE OF NEBRASKA, APPELLEE, V. R.W.K. AND E.E.K.,
APPELLANTS.
420 N.W.2d 718

Filed March 18, 1988.   No. 87-610.

Louie M. Ligouri, for appellants.

Douglas E. Merz, Richardson County Attorney, and Curtis L. Maschman, guardian ad litem, for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

Hastings, C.J.

This is an appeal by the parents of A.M.K., seeking to reverse an order of the county court, juvenile division, which terminated their parental rights. The parents insist that the order is not sustained by the evidence.

Both of the parents are of limited intellectual ability; the father is mildly mentally retarded and possibly has an underlying personality disorder, while the mother is in the dull normal to borderline range of intellectual functioning, with an IQ ranging in the low 80s.

Although no question of jurisdiction has been raised, we note the fact that on September 12, 1983, the father appeared in county court with his guardian ad litem, Willis G. Yoesel; it was found that the father was incapacitated, and a guardian, other than the guardian ad litem, was appointed to provide for the care and supervision of the father. The named guardian has not been a party to these termination proceedings. The record does not disclose whether the guardian is still acting. However, both parents have been represented by Willis Yoesel as court-appointed counsel throughout the proceedings in county court. On January 21, 1987, following the filing of the motion to terminate parental rights, Willis Yoesel was appointed as guardian ad litem to represent both parents. The child also had a guardian, who joins with the position of the State. The record does not contain copies of any summons or other process that may have been served; however, the parents appeared at all hearings together with Willis Yoesel.

Every court has inherent power to appoint a guardian ad litem to represent an incapacitated person in that court. *In re Guardianship of Jonas*, 211 Neb. 397, 318 N.W.2d 867 (1982). "If the person to be served [by summons] is an incapacitated person for whom a . . . guardian has been appointed . . . notice of the service shall be given to the . . . guardian . . . . *Failure to give such notice does not affect the validity of the service on the incapacitated person.*" (Emphasis supplied.) Neb. Rev. Stat. § 25-508.01(3) (Reissue 1985).

The minor child, who was born on June 10, 1985, also has special needs. She is handicapped, with both developmental and physical disabilities which require an extraordinary

amount of time and effort on the part of those who care for her. The issue, then, is whether the parents are equipped to handle the special demands placed on them by virtue of their daughter's problems.

Shortly after A.M.K.'s birth, a registered nurse was assigned to supervise her care at home. The appellants cared for their daughter in their home until July 31, 1985, when the nurse noticed that the girl's leg was extremely swollen. The diagnosis was a spiral fracture of the femur. The child was subsequently placed in the care of the Department of Social Services, and a motion to terminate parental rights was filed.

The juvenile court subsequently ordered a reunification plan. As part of this plan, supervised visitations began under the direction of social services. This continued until May 1986, with the goal being to help the parents develop the necessary parenting skills needed to care for their daughter. Additionally, they were to be instructed in how to administer the physical therapy which was needed by their daughter. This therapy would take several hours per day to administer.

The child was returned for an overnight, unsupervised visit with her parents on May 15, 1986. After this visit, red marks were noticed on her chest, and she was again placed in foster care.

The parents were also to attend sessions with a physical therapist so he could teach them how to conduct the physical therapy procedures required by their daughter. The parents attended only two of these sessions, and the mother refused to attempt any of the procedures on her own, later explaining that she was afraid to do so.

The trial court found that although it appeared the appellants had attempted to cooperate and to improve themselves so they would be able to care for their daughter, they had been unable to do so, given their limited abilities and the special care required by their daughter.

Experts testified that the parents' mental deficiencies would be expected to continue indefinitely. There was also testimony to the effect that above-average parenting skills would be needed to properly care for the child. Additionally, a doctor testified that neither parent would be able to adequately

discharge his or her parental responsibilities toward the daughter. The juvenile court ordered that it would be in the best interests of the child to terminate the appellants' parental rights.

Neb. Rev. Stat. § 43-292(5) (Reissue 1984) provides that the court may terminate parental rights when it is in the best interests of the child to do so and "[t]he parents are unable to discharge parental responsibilities because of mental illness or mental deficiency and there are reasonable grounds to believe that such condition will continue for a prolonged indeterminate period."

There was substantial evidence that the parents' mental deficiencies would be continued for a prolonged and indeterminate period of time. There does not seem to be any substantial issue regarding that fact. The parents' appeal, rather, hinges on whether these deficiencies were sufficient to cause an inability to care for their daughter. The testimony of Dr. Collamer was that their deficiencies would cause such an inability. Furthermore, the physical therapist stated that the child would require physical therapy for the rest of her life and that it is needed daily at this point. She will always need aid from someone to accomplish this therapy. The physical therapist testified that neither parent would be able to provide this assistance. In addition, there was evidence that on at least two occasions the child suffered injuries while under her parents' care, one of these injuries being very serious.

In the appellants' favor, they had shown some improvement in their parenting skills. The child was apparently always clean and dry while in their care, and there was no evidence that the child ever went without food or shelter.

In *In re Interest of Wanek*, 212 Neb. 394, 322 N.W.2d 803 (1982), this court terminated the parental rights of a mother who was mildly retarded and functionally illiterate. The mother also had a severe alcohol problem. The evidence showed that she was unable, without daily supervision, to care for the needs of her children, one of whom was borderline retarded. The court concerned itself with the best interests of the children, finding that overwhelming evidence showed that, unsupervised, neither parent could ever be responsible for the

care of the children because of mental or psychological deficiencies. The court stated:

> We have held before that where a parent is unable to discharge parental responsibilities because of mental deficiency, and where there are reasonable grounds to believe that such condition will continue for a prolonged and indeterminate period, the parental rights may be terminated when such action is found to be in the best interests of the child or children.

*Id.* at 398, 322 N.W.2d at 806. This position was reiterated by the court in *In re Interest of Fant*, 214 Neb. 692, 335 N.W.2d 314 (1983), in which the appellant had a borderline personality disorder and a severe mental disorder which rendered her incapable of effectively caring for her children.

Evidently, most of the cases decided under § 43-292(5) deal with a mental illness, rather than low intelligence. For instance, in *In re Interest of B.F.R.*, 217 Neb. 94, 348 N.W.2d 125 (1984), the mother suffered from schizophrenia and paranoia, and was able to control her life only in the most minimal sense and only with the help of large amounts of medication. The court found that the child could not "be made to face this uncertainty. His best interests and his future stability require that parental rights be terminated." *Id.* at 96, 348 N.W.2d at 127.

Similarly, in *In re Interest of Farmer*, 210 Neb. 500, 315 N.W.2d 454 (1982), the mother was unable to discharge her parental responsibilities because of schizophrenia. The court held that where the natural parent cannot rehabilitate herself within a reasonable time, the best interests of the child require that a final disposition be made without delay.

Thus, the standard is whether it would be in the best interests of the minor child to terminate the appellants' parental rights. That is, the evidence must show that because of the appellants' mental deficiencies, they are unable, and will be unable for a prolonged and indeterminate period of time, to properly care for their daughter's special needs.

The facts in this case demonstrate an impossible situation, and there is no realistic hope that these parents will ever be able to discharge their parental duties in a manner satisfactory to the best interests of the child.

The judgment of the juvenile court is affirmed.

AFFIRMED.

CAPORALE, J., dissenting.

I must dissent, not only because I have procedural concerns, but because in my view the majority's substantive disposition is legally incorrect.

I first question whether the guardian ad litem appointed for a mentally ill or deficient parent, as required by the provisions of Neb. Rev. Stat. § 43-292 (Reissue 1984), can properly be the same individual as the one serving in the capacity of legal counsel to the parent. In *Orr v. Knowles*, 215 Neb. 49, 337 N.W.2d 699 (1983), we, in the context of considering the functions of a guardian ad litem for a minor seeking an abortion, vis-a-vis the functions of one serving as legal counsel to the minor, held that the duties of a guardian ad litem are not coextensive with those of legal counsel. The *Orr* opinion explained that it is not an attorney's role, when acting as legal counsel, to independently determine what is in his or her client's best interests but, rather, to act in accordance with the client's wishes, provided those wishes are within an attorney's ethical obligations; a guardian ad litem, on the other hand, may determine his or her ward's best interests without reference to the ward's wishes.

Just as an independent investigation might reveal a minor's wish to have an abortion not to be in her best interests, so, too, might an independent investigation reveal a mentally ill or deficient parent's wish to preserve his or her status as a parent not to be in his or her best interests. The question of such a parent's best interests is different than what is in the best interests of his or her child, the only interest which the juvenile court may adjudicate.

There may be some, perhaps many, who would opine that providing a mentally ill or deficient parent with a guardian ad litem as well as a separate attorney is unnecessary and a needless expenditure of funds, public or otherwise. The fact remains, however, that the question is one of public policy which the Legislature and our law seem to have decided. I am not unmindful that, ordinarily, when a guardian ad litem is to be appointed for a juvenile under Neb. Rev. Stat. § 43-272

(Reissue 1984), the guardian is to be an attorney and that such appointee is to act as his or her own legal counsel, as well as that of the juvenile. Even that statute recognizes, however, that a particular case may present special circumstances requiring the guardian ad litem or the juvenile, or both, to have separate counsel. Nor does *Chalupa v. Chalupa*, 220 Neb. 704, 371 N.W.2d 706 (1985), which holds that in the usual dissolution case adequate legal representation of the competing interests of the parties makes unnecessary the extra expense and delay of appointing separate counsel to represent the interests of the children, answer the question which concerns me. While *Chalupa* seems to assume that legal counsel and a guardian ad litem perform the same function, it neither analyzes the issue nor refers to the earlier holding in *Orr v. Knowles, supra*.

Having pointed out the confusion that surrounds the responsibilities, obligations, and duties of attorneys who permit themselves to be put in the position of attempting to serve potentially conflicting interests as both legal counsel and guardians ad litem, a confusion which may arise from the effort to turn courts of law into social services agencies, I turn my attention to the substantive issues presented by this case and leave the procedural concerns for resolution in a case which squarely presents and briefs the procedural problem.

The subject parents are both 38 years old. A.M.K. was born on June 10, 1985. Sadly, the child suffers from "developmental delays, and spasticity." She also exhibits signs of microcephaly (an abnormal smallness of the head, usually associated with mental retardation), seizure disorders, and cerebral palsy. In the opinion of Dr. William Collamer, a psychologist who served as the State's expert witness in the juvenile court, the child has some "physical problems [and] . . . developmental delays in terms of cognitive skills and intellectual functions." Nevertheless, the child generally presents the appearance of a healthy, attractive, and happy baby.

The father has been described as "mildly mentally retarded." Yet, he has found seasonal or periodic employment as a farm laborer. The mother has a speech impediment and has been described as "between the dull normal to borderline range of intellectual functioning," having scored between 81 and 85 in

an intelligence test. Collamer testified that persons with intelligence quotient test scores in the range of 80 to 90 would be considered "dull normal." In the population as a whole, one would "expect one half of the scores to be above 100, and one half of the scores to be below 100." The meaning of these numbers is further clarified by Collamer's testimony that "probably" 76 percent of the population falls in the 85 to 115 range of scores and his admission that the ability to be a parent cannot be determined from "an intelligence score, you have to look at all of the capabilities."

The father has an academic achievement comparable to that of the typical fourth grade student, while the mother has an academic achievement comparable to that of the typical eighth grade student. The record clearly discloses that the mother has adequate academic ability to write thoughtful and reasonably well-written letters protesting her forced separation from her daughter.

Apparently owing to the child's developmental difficulties, she came to the attention of this state's social services providers on the day after her birth. At that time, specialists began evaluating and treating the child, and the parents were furnished with a number of services. The parents have taken parenting classes, have participated in home-based family therapy, have undergone psychological evaluations, and have been exposed to a variety of family support workers, including some who worked with the parents in their home.

According to David Nachtigal, a physical therapist who has worked with the child since her early days, correcting her disabilities will require ongoing physical therapy into adulthood. Among other things, the child must presently be positioned and maneuvered so that she may learn to use her hands and legs. The nature of the therapy required will change at frequent, perhaps weekly, intervals as the child matures.

Nachtigal spent only two 1-hour sessions with the parents to teach them what had to be done. Janice Sanchez, a state protective services caseworker responsible for the child's case, testified she did not know why the parents did not spend more time in the therapy sessions with their daughter. The mother testified to the effect that neither she nor the father realized that

they were invited to attend further sessions. On both days that the parents met with Nachtigal, the father performed exercises with his daughter under Nachtigal's direction, but the mother preferred to just observe. Nachtigal also testified that "[i]t definitely would take more than two sessions to be able to learn this type of activity" and that the father was not yet able to perform the techniques to Nachtigal's satisfaction, but that at least he did try. The mother, who expressed confidence in her ability to learn the exercises, given training, indicated she did not participate in exercising the child because she did not fully understand the exercises at that time and wanted to avoid doing anything that might injure the child. The record reveals the exercises were very complex and require placing the child in weight-bearing positions.

The child came to the attention of the juvenile court and was removed from the parental home and placed in foster care on July 31, 1985, when, at age 7 weeks, she suffered a spiral fracture of the femur. The record does not tell us how the injury occurred, nor what its manifestations were. The record does, however, reflect that while in the parents' possession and care, the child "was clean and dry. They [the parents] were a little rough in handling the child, and had to be reminded several times to support her head." They were able to feed the child properly and maintained their home in reasonably good order.

In the early period of foster care the child was transported to the parents' home by Betsy Mack, an employee of the state Department of Social Services, who supervised the child's weekly visit with her parents and instructed the parents in parenting skills. In Mack's words,

> I didn't actually do very many things myself; I was more observing; a little bit of showing how; but, it was pretty much they did the things, did what needed to be done. We worked on feeding; she was hard to feed, she would choke, just on a bottle, even; it was — you'd have to be very careful feeding her a bottle or she would choke. Also, I tried to teach just how persistive they would have to be doing this, and consistent to just do the same things over and over.

During these visits, the mother would bathe her daughter and

usually took the responsibility for hand-feeding the child her solid baby food. Each parent took turns bottle-feeding the child. Mack observed that the parents seemed apprehensive about engaging in the child's exercise routines and did not do so frequently. However, Mack herself seems to have experienced some apprehension regarding her own ability to engage the child in her exercises, noting, "Well, really, in three visits [with the physical therapist] I prob- — wasn't knowledgeable enough to have done it on a continual basis; I would of had to have learned a lot more."

At one point the father had to be told not to give his daughter her medication twice in one day, rather than the prescribed single administration, in the hope that "this way she could get well quicker."

Following her first unsupervised overnight visit with her parents, the child was returned to her foster family at 8:30 in the morning on May 16, 1986. At 10:30 a.m., red marks were noticed on the child's chest. The child was examined by a physician, who concluded the marks were not signs of any serious injury. The mother noted that she had taken the child outside in a stroller twice during the day of the unsupervised home visit, and speculated that perhaps the red marks resulted from the child's being bounced about a bit while strapped in a baby stroller for a walk over an uneven sidewalk. The photographs contained in the record depict marks which are consistent with the mother's speculation as to their cause. Nonetheless, because of these red marks, the parents were allowed no further unsupervised visits with their daughter and only drastically curtailed supervised visits.

The record reflects the mother recognizes that she needs help to take care of her child. Collamer and a Dr. Robert Heins, a psychiatrist, are of the opinion that the mother is not competent to care for the child by herself on a daily basis, although Heins states no independent basis for his opinion apart from one "session with her today." The record demonstrates, however, that both the mother's and father's parental skills have shown consistent improvement.

The record also demonstrates that the parents have been consistent and insistent in their desire for more contact with

their daughter and that both parents have cooperated with the Department of Social Services in carrying out their treatment plan.

In an appeal from a judgment terminating parental rights, we are obligated to try the factual questions de novo on the record and reach a conclusion independent of the findings of the trial court but, where evidence is in conflict, consider and may give weight to the trial court's observation of the witnesses and acceptance of one version of the facts rather than another. *In re Interest of L.H., ante* p. 857, 420 N.W.2d 318 (1988); *In re Interest of J.S., A.C., and C.S., ante* p. 251, 417 N.W.2d 147 (1987).

As this court recently observed, the unequivocal language of § 43-292 imposes two requirements before parental rights may be terminated. The evidence must clearly and convincingly establish, first, that there exists a legal ground for terminating parental rights and, second, that such termination is in the child's best interests. *In re Interest of L.H., supra; In re Interest of J.S., A.C., and C.S., supra.*

There is no doubt but that the parents suffer from "mental deficiency and there are reasonable grounds to believe that such condition will continue for a prolonged indeterminate period." § 43-292(5). However, the record does not support a finding that it is for this reason the parents are unable to discharge their parental responsibilities, nor does it establish that termination of the parents' rights to their daughter is in the child's best interests.

With regard to the question of causality, the record clearly demonstrates that the child's special needs are such that even many intellectually gifted parents would not be able, without assistance, to provide the care that the child requires. Specialists will be required to assess the child's ongoing therapy program on a regular and continuing basis. These experts will need to modify the child's therapy as her needs change, and they will then be required to teach these new therapeutic exercise programs to the child's caregivers, whoever they may be. The mere fact that the child's natural parents may learn these exercise programs more slowly than might some other person does not, of itself, provide a basis for terminating their parental

rights. Furthermore, it stretches the imagination to think that even most intellectually gifted parents would have the time to oversee all of the child's inhome therapy by themselves; like the parents, any other homemaker would require outside help to meet the child's special need for daily physical therapy.

Therefore, it cannot be said that the parents' inability to provide for their daughter's needs results from their mental deficiencies; rather, their inability to provide for the child's needs by themselves results from the fact that these needs are special. Our statutes make no provision for termination of parental rights on the basis of a child's special needs.

Furthermore, the record fails to clearly and convincingly establish that termination of her parents' rights will be in the child's best interests. Rather, the reverse is true; the record clearly and convincingly demonstrates that these parents love their daughter and, yet, under circumstances of great stress, recognize their own limitations and are willing to work to overcome them. I do not overlook the fact that there is no explanation for the fracture the child sustained. I suggest, however, that the fact the child sustained a fracture while in her parents' care does not prove the parents to be unfit to retain their legal ties to their daughter. Human experience is replete with examples of children injured while in the possession, care, and control of intelligent, competent, loving, and nurturing parents. Neither is the failure of intelligent, competent, loving, and nurturing parents to recognize a fracture as early as one might wish outside the range of normal human experience. Nor is overmedication in the hope of speeding recovery unknown among otherwise intelligent people. While these occurrences establish that the child is in a situation injurious to her health and thus, under the provisions of Neb. Rev. Stat. § 43-247(3)(a) (Cum. Supp. 1986), present a basis for the juvenile court to assert jurisdiction and place her in foster care, they do not furnish a legal ground for terminating parental rights.

The policy of this state regarding termination of parental rights has been set out in Neb. Rev. Stat. § 43-246 (Cum. Supp. 1986), which provides that the goals of "assur[ing] the rights of all juveniles to care and protection and a stable living environment and to development of their capacities for a

healthy ˙personality, physical well-being, and useful citizenship," are to be pursued through methods which

> separat[e] the juvenile from his or her parent only when necessary for his or her welfare or in the interest of public safety and, when temporary separation is necessary, to consider the ·developmental needs of the individual juvenile in all placements and to assure every reasonable effort possible to reunite·the juvenile and his or her family.

It is not the policy of this state to separate children from their natural parents merely because the parents are "mildly mentally retarded" or the children "developmentally disabled." Rather, it· is axiomatic that once there has been.the adjudication that a child is a juvenile within the meaning of the act, the foremost purpose or objective of the Nebraska Juvenile Code is promotion and protection of a juvenile's best interests, with preservation of the juvenile's familial relationship with his or her parent(s) where continuation of the parental relationship is proper under the law. *In re Interest of J.S., A.C., and C.S., ante* p. 251, 417 N.W.2d 147 (1987).

Termination of parental rights is permissible when there exists.no other reasonable alternative in the best interests of the child and only as a last resort when the basis for such is proved by clear and convincing evidence. *In re Interest of J.S., A.C., and C.S., supra; In re Interest of T.C.*, 226 Neb. 116, 409 N.W.2d 607 (1987). In my view the record does not demonstrate the absence of any reasonable alternative. Quite the contrary, the record demonstrates that the child faces exactly the same alternatives regardless of whether the rights of her parents are terminated; the child will need to be provided intensive special services, most likely at public expense, by specialists both inside and outside her home, for years to come.

· Under these circumstances, I cannot conclude it is better for the child to·grow up. without legal ties to her natural parents, even if those. natural parents' human frailties are perhaps somewhat more apparent than most. Certainly, childhood with loving natural parents, even if one cannot live with those parents, is far preferable to childhood without them. Indeed, if a child such as A.M.K. were voluntarily institutionalized by intellectually gifted parents, we would not terminate their

parental rights on the ground they had proved themselves incapable of taking care of the child in their home. In my view the best interests of A.M.K. demand that she travel the path fate has decreed for her, if not in the company, then with the emotional support, of her parents, their own frailties notwithstanding.

I would therefore reverse the judgment of the juvenile court and continue foster care for the child.

SHANAHAN, J., joins in this dissent.

WHITE, J., dissenting in part.

Although I agree with the majority's disposition of this case, I join with that part of the dissent which questions whether a guardian ad litem and legal counsel can be one and the same person in cases adjudicated pursuant to Neb. Rev. Stat. § 43-292(5) (Reissue 1984).

I am of the opinion that our analysis and holding in *Orr v. Knowles*, 215 Neb. 49, 337 N.W.2d 699 (1983), is dispositive of the question. If one compares the societal and individual interests involved in cases of minors seeking abortions with cases where parental rights may be terminated due to a parent's prolonged mental illness or mental deficiency, it seems that the function and necessity of a guardian ad litem in these cases is analogous, if not identical. Therefore, eadem est ratio, eadem est lex (the reason being the same, the law is the same). In both cases the duties of a guardian ad litem are not coextensive with those of legal counsel.