In re Interest of M.M., C.M., and D.M., children under 18 years of age.
State of Nebraska, appellee, v. C.M., appellant.

452 N.W.2d 753

Filed March 23, 1990.   Nos. 89-456, 89-463, 89-464.

Mark M. Sipple, of Luckey, Sipple, Hansen, Emerson & Schumacher, for appellant.

No appearance for appellee.

Mariclare Thomas, guardian ad litem for appellant.

Frank J. Skorupa, guardian ad litem for children.

Hastings, C.J., Boslaugh, White, Caporale, Shanahan, Grant, and Fahrnbruch, JJ.

White, J.

This is an appeal from orders of the Butler and Seward County Courts terminating appellant's parental rights. We affirm.

This is the second time this matter has been before this court. In *In re Interest of M.M., C.M., and D.M.*, 230 Neb. 388, 431 N.W.2d 611 (1988), appellant appealed orders of the Butler and

Seward County Courts terminating her parental rights. We held that the failure to appoint a guardian ad litem for the mother under Neb. Rev. Stat. § 43-292 (Reissue 1988) was plain error and reversed and remanded for further proceedings. A guardian ad litem was subsequently appointed for appellant. On January 10, 1989, the guardian ad litem for the three children again filed a petition for termination of parental rights pursuant to § 43-292(5), alleging that the mother is "unable to parent due to mental illness or mental deficiency and there are reasonable grounds to believe the conditions preventing her from parenting will continue for a prolonged and indeterminate period." After a hearing, the trial court again terminated the mother's parental rights.

We note here that each child allegedly has a different biological father. None of the alleged fathers answered or appeared. After finding that proper notice was given each father, the trial court terminated each father's parental rights. Only the mother has appealed the termination order.

Summarized, appellant contends on appeal that the trial court erred in terminating her parental rights and erred in finding that no reasonable alternative short of termination of parental rights would be in the best interests of the children.

In an appeal from a judgment terminating parental rights, the Supreme Court tries factual questions de novo on the record, which requires it to reach a conclusion independent of the findings of the trial court, but, where evidence is in conflict, the Supreme Court considers and may give weight to the fact that the trial court observed the witnesses and accepted one version of the facts over another. *In re Interest of N.L.B., ante* p. 280, 450 N.W.2d 676 (1990).

We have reviewed the record de novo and make the following findings of material fact. Appellant is the mother of three children: D.M., a male born September 12, 1980; M.M., a male born March 7, 1983; and C.M., a female born March 29, 1986. The children are currently living with foster parents, David and Yvonne Justice.

Appellant has admitted in a responsive pleading that "she is afflicted with a bipolar disorder with psychosis; she further admits that at times she is overcome by delusional process

which is complicated by grandiose thinking . . . ." The record abundantly supports this admission. This mental illness is caused by a chemical imbalance in the brain. It is not curable, but is treatable with medication and therapy. A successful treatment program is dependent upon appellant's recognizing and accepting that she is mentally ill and that she must comply with the treatment program. The record shows, however, that appellant's acceptance of her illness is merely superficial. Dr. George Hachiya, appellant's psychiatrist, testified that once appellant starts feeling well she denies she is mentally ill and that she has a need for medication, and she abandons her treatment program, whereupon her condition again deteriorates. Throughout the long course of litigation in this matter, appellant has demonstrated a marked inability or unwillingness to maintain her treatment program or to cooperate in a structured, therapeutic environment. There is nothing in the record to suggest that appellant will at some point fully comply with any treatment program. Without therapy and medication, the likelihood of a long-term remission is slight.

The evidence also shows that without full compliance with the prescribed treatment program, appellant's mental illness prevents her from adequately parenting. Dr. Hachiya testified as to how appellant's mental illness adversely affects her ability to parent:

> Under the delusion of grandeur, she feels that she is a wealthy person. My understanding is that she is not. So therein lies a conflict. How can she provide for these kids when she is more or less, you might say, destitute? She cannot financially provide for her kids, because with the delusional system, she is not able to be gainfully employed at this time. With a delusional system, she becomes very angry towards other people who are trying to help her children. This is part and parcel of her delusions of persecution. With a delusional system, I got the feeling — she feels that she is an ideal mother. The question is, is she an ideal mother? When she is functioning under the delusional system and when she is manic, I do not think that she can function as an idealized mother.

Dr. Hachiya's testimony is supported by the testimony of

three babysitters who cared for the children while appellant had custody of the children, and by the testimony of Yvonne Justice. In sum, the babysitters testified that when appellant would arrive with the children, the children would sometimes be inappropriately dressed or be urine soaked. The children were sometimes unbathed. There was also evidence that the children, while in appellant's care, were not being properly fed. In one instance, appellant "said she had lunch in the car and all he [D.M.] had was a hot dog stuffed in his coat pocket, which was not edible. It was just a hot dog just stuffed into his coat pocket, and she said that was lunch — that he had his lunch with him." For the baby, appellant would sometimes supply bottles of rancid formula. Yvonne described C.M.'s condition when she first received her from appellant in 1986:

> She came in a basket. It was — it's like an old-fashioned laudry [sic] basket with — it's wicker and there was no padding in the basket. There was a piece of blue paper in the bottom and then there were two receiving blankets and then there was [C.M.]. The little pieces of wicker were sticking up on the bottom. It was not very comfortable. She had on a pamper that was — if I would have picked the baby up, the pamper would have fallen off. The pamper was clean. When I took the pamper off, I was by myself. There was no one else there, but [C.M.] was not very clean, and when I saw her diaper rash, to me, it was very severe. It was very red. It looked like a severe sunburn. Her skin was very rough. It covered the entire diaper area. There was — between her little folds there was feces that had not been cleaned out, and from — I have two children of my own and from experience from them I would say that a rash like that would not occur just in a few hours.

Significantly, appellant has maintained throughout the entire proceedings that she is a fit mother.

This court has previously stated that where a parent is unable to discharge parental responsibilities because of mental deficiency, and where there are reasonable grounds to believe that such condition will continue for a prolonged and indeterminate period, the parental rights may be terminated

when such action is found to be in the best interests of the child. *In re Interest of A.M.K.*, 227 Neb. 888, 420 N.W.2d 718 (1988).

In the present case the evidence clearly establishes that appellant, because of her mental illness, cannot discharge her parental responsibilities. The evidence also shows that her mental illness will continue for a prolonged and indefinite period.

It is equally clear that termination of appellant's parental rights is in the best interests of the children. This court has stated that when a natural parent who suffers from mental deficiency cannot be rehabilitated within a reasonable time, the best interests of the child require that a final disposition be made without delay. See *In re Interest of Farmer*, 210 Neb. 500, 315 N.W.2d 454 (1982). "A child cannot, and should not, be suspended in foster care, nor be made to await uncertain parental maturity." *In re Interest of C.N.S. and A.I.S., ante* p. 406, 410, 451 N.W.2d 275, 278 (1990). In addition, Dr. Hachiya testified that "the nature and the degree of [appellant's] psychotic thought process will negatively affect the kids," because the children, who think in concrete terms due to their age, will begin to identify with and imitate appellant.

We are also convinced that no reasonable alternative short of complete termination exists. The record shows that contact with appellant, whether through visitations or otherwise, has been detrimental to the children and to those individuals who are responsible for their care. The children were placed in the Justice home at the request of the prior foster parents, Philip and Cindy Bader. Philip Bader is appellant's natural brother. The Baders asked that the children be removed from their home because "they just felt they could not deal with the family — the extended family." The extended family referred to appellant and her mother, LaVern Bader, who would make unannounced visits to see the children and blame the Baders "for a lot of the things that were happening . . . ."

While the children were at the Justice home, appellant was allowed periodic visits at various locations. These visits were difficult. D.M. suffered anxiety problems due to the sporadic and unreliable nature of the visits. Appellant was often unavailable for scheduled visits due to overseas "business"

trips, admission to the Lincoln Regional Center, or court orders. A child counselor testified that this inconsistency was detrimental to D.M., who is older and more mature than the other two children, in that "it was creating some anxiety for him because he was being torn in two different directions." He also testified that the two younger children were unaffected because strong bonding to appellant was not present.

During the visits, appellant would create unrealistic expectations in the children. For example, appellant "would tell [the children] that they were coming home soon, that she had the farm ready for them, their bedrooms were ready. She had playground equipment for them." In one instance, appellant gave D.M. a suitcase and apparently told him to put his clothes and toys in it because she was taking him away. She would also tell the children she was exceedingly wealthy and owned large amounts of real and personal property. If a supervisor was not present to intervene, the children, who were unable because of their age to discount these statements as mere manifestations of appellant's mental illness, accepted them as true. Once they developed these unrealistic expectations, the boys became unruly and difficult to control. C.M. remained unaffected.

The children's behavior and mental well-being were adversely affected by the visits. Yvonne testified that, although their behavior prior to visitations was normal, the boys experienced problems after visitations. For example, during a 7-month period when visitations ceased due to appellant's admission to the regional center, the children behaved normally. However, the boys' behavior deteriorated once visitation resumed. D.M. became depressed, experienced nightmares, and became overprotective of M.M. and C.M. M.M. became destructive and angry. Both boys would urinate on the wall in the bathroom. Yvonne testified that once the visitations ended, the aberrant behavior also stopped.

Contact with appellant has also been stressful for the foster family. Appellant would often make unscheduled visits, disrupting the Justice household. Yvonne also testified to several incidents of harassment by appellant. She testified that "[w]e've had phone calls where she [appellant] would want to talk to me and try to convince me that I should be giving the

children back to her, that what I was doing was immoral and wrong. And I tried to explain to her that my only job was to give her children a home." On another occasion appellant went to the Justice home with a letter, telling Yvonne that "the letter was an order from the judge that I was to pack the boys' suitcases and give them to her, and she was going to take them with her." In another incident, appellant went to the Justice home one evening at approximately 10:30 p.m., left a packaged birthday cake on the doorstep, then fled. Yvonne, fearing reprisals from appellant, called the police, who "treated the cake as a bomb. And — which is what I thought it was." In still another incident, appellant approached Yvonne in a doughnut shop, demanded that the children be returned to her, and stated, "I don't want trash like you raising my kids. And you give them back to me." As a result of these contacts, the foster family has grown quite apprehensive of further contact.

It is clear that the appellant's past regimen of contact has been unsuccessful and harmful to the parties involved. While we recognize that termination of parental rights should be used only as a last resort, the record clearly shows that prolonging this difficult situation by anything less than complete termination would be pointless. D.M. and M.M. have been living with the Justices continuously since November 1985. C.M. was separated from appellant 3 weeks after her birth and has lived with the Justices continuously since that time. The relationship among the three children is normal. The foster parents have two children of their own, a male and a female, who are now approximately ages 18 and 15, respectively. The Justice family appears in all respects to have furnished a stable and loving environment. All three children have bonded well with the foster family and regard the Justice children as natural siblings. Yvonne testified that they love the three children as their own. D.M. and M.M. refer to Yvonne as "mom." Yvonne testified that M.M. and D.M. have improved and are doing well scholastically and socially. C.M., having been separated from her natural mother shortly after birth, regards Yvonne as her natural mother. C.M. was baptized in the Justices' church. The Justices have indicated a willingness to adopt all three children, but fear continuing interference by appellant.

After thoroughly reviewing the lengthy record in the case, spanning a time period of approximately 6 years, we are convinced that nothing short of complete termination would be in the best interests of the children. Accordingly, the orders of the Butler and Seward County Courts terminating appellant's parental rights are affirmed.

AFFIRMED.