In re Interest of C.P., a child under 18 years of age. State of Nebraska, appellee, v. M.A., appellant.

455 N.W.2d 138

Filed May 4, 1990. No. 89-780.

Mark J. Slowiaczek for appellant.

Ronald L. Staskiewicz, Douglas County Attorney, and Elizabeth G. Crnkovich for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

FAHRNBRUCH, J.

The appellant, M.A., seeks to overturn a juvenile court order terminating her parental rights in her 5-year-old daughter, C.P.

M.A. claims the termination order was improper because the Douglas County Separate Juvenile Court (1) did not hold an adjudication hearing within the time directed by statute and (2) erroneously found that termination of M.A.'s parental rights was in the best interests of the child. We affirm.

Appellant's parental rights were terminated because she substantially and continuously or repeatedly neglected C.P. and refused to give her child necessary parental care and protection. T.P., the natural father, has not appealed the order terminating his parental rights.

> In an appeal from a judgment terminating parental rights, the Supreme Court tries factual questions de novo on the record, which requires it to reach a conclusion independent of the findings of the trial court, but, where evidence is in conflict, the Supreme Court considers and may give weight to the fact that the trial court observed the witnesses and accepted one version of the facts over another.

*In re Interest of M.M., C.M., and D.M.,* 234 Neb. 839, 840, 452 N.W.2d 753, 755 (1990).

Based on a de novo review of the record and giving weight to the fact that the trial court observed the witnesses and accepted one version of the facts over another, the record reflects the following. C.P. was born on September 22, 1983, to T.P. and M.B., now known as M.A. T.P. also fathered another child by M.A. That child is not involved in this action. T.P. and M.A.

were never married, but periodically resided together for some period of time before and after C.P. was born.

During the term of her pregnancy with C.P., T.P. hit and kicked M.A. After the child was born, T.P. punched M.A., slammed her head into cabinets, threatened to kill her with a knife, threw objects at M.A., and bit her on the arms, legs, and breasts. This abuse was on an ongoing basis. M.A. left T.P. on several occasions due to T.P.'s mistreatment. In addition, M.A. observed T.P. hit C.P. with a stick, board, and belt and observed him strike the child about the face and head with his hand and fist, leaving marks and bruises.

On January 18, 1984, while M.A. and T.P. were living apart, M.A. informed the Omaha Police Division that T.P. abducted C.P. from M.A.'s home when M.A. told T.P. that she was going to take the child to Arkansas. C.P. was returned to M.A. The police advised M.A. to seek legal action to determine which party was entitled to custody of the child.

The record is unclear as to when T.P. and M.A. permanently broke off their relationship, but it appears to have occurred some time prior to 1987. After T.P. and M.A. separated, M.A. initially took C.P. with her but, at a later date, allowed T.P. to have custody of their child. T.P. had custody of C.P. from 1985 until the child was brought to the attention of authorities in May 1988.

M.A. has seen C.P. on only one occasion since sometime before April 1987. On April 13, 1988, M.A. briefly glimpsed her daughter in T.P.'s car when T.P.'s mother took birthday gifts to M.A.'s two sons. M.A. testified that she stopped visiting her daughter because she got married.

Before December 1987, T.P., along with C.P., began residing with G.P. and her two children. T.P. was not the father of G.P.'s two sons, 4-year-old J.B. and C.B., who was an 18-month-old infant. T.P. and G.P. had a daughter, A.P., born in May 1988.

On approximately May 19, 1988, C.B., in a life-threatening condition, was taken to a hospital by G.P. and T.P. The child had a subdural hematoma, which is a bleeding inside his skull, that was placing pressure on the brain. C.B. had been severely abused for some period of time. He had a number of fractures and bruises, some of which were older and in the process of

healing. C.B. subsequently died from his head injuries. The evidence in this case reflects that the fatal injuries occurred when T.P. threw C.B. at J.B. and C.B. hit the floor.

Due to the nature of C.B.'s injuries and the unknown whereabouts of the other children, Omaha police officers became concerned about the other children's safety. On the evening on which C.B. was taken to a hospital, police, after being misdirected, located C.B.'s siblings and C.P. at their home. The home was found to be filthy and littered with clothing, debris, cat feces, and discarded food. It smelled of urine. C.P. was disheveled and dirty, with matted hair.

The police transported the children to a hospital, where they were examined by an emergency room physician. A physical examination of J.B. revealed a number of fractures, bruises, cuts, and areas of swelling. It was later determined that T.P. had brutally abused J.B. for some months. The extent of the abuse is recited in *In re Interest of J.B. and A.P., ante* p. 74, 453 N.W.2d 477 (1990).

C.P.'s examining physician described her as very anxious and nervous. During his examination of C.P., the doctor did not find any physical injuries. However, C.P. informed a police officer that her father "beat [her] ass." G.P. also testified that when the child wet her pants, T.P. beat her with a belt.

On June 2, 1988, a petition was filed in the separate juvenile court of Douglas County to terminate the parental rights of M.A. in C.P. This case was consolidated for trial in the juvenile court with the case that was decided by *In re Interest of J.B. and A.P., supra*. The children were initially placed in the custody of the Nebraska Department of Social Services. After holding a detention hearing on June 28, 1988, the court ordered that temporary custody of C.P. be continued with the Department of Social Services for appropriate foster care placement. After conducting an adjudication hearing on May 3 and 4, 1989, the court found by clear and convincing evidence that C.P. was a child within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 1988). In relevant part, § 43-247(3)(a) provides the juvenile court with exclusive original jurisdiction over any juvenile

who is abandoned by his or her parent . . . who lacks

proper parental care by reason of the fault or habits of his or her parent . . . whose parent . . . neglects or refuses to provide proper or necessary subsistence, education, or other care necessary for the health, morals, or well-being of the juvenile.

After finding by clear and convincing evidence the existence of the condition described in Neb. Rev. Stat. § 43-292(2) (Reissue 1988), the court terminated M.A.'s parental rights in C.P. Section 43-292(2) provides that parental rights to a child may be terminated where "[t]he parents have substantially and continuously or repeatedly neglected the juvenile and refused to give the juvenile necessary parental care and protection."

As indicated, the petition to terminate M.A.'s parental rights in C.P. was filed on June 2, 1988. On August 15, 1988, the parties agreed that the termination proceedings would be postponed until after completion of T.P.'s criminal trial for second degree murder of C.B. and first degree assault and child abuse on J.B. T.P. was found guilty of the three charges on November 17, 1988. He was sentenced on January 6, 1989. On May 3, 1989, M.A. filed a motion to dismiss the petition on the basis that the adjudication hearing was not held within the time directed by statute. The juvenile court judge overruled M.A.'s dismissal motion, immediately after which the adjudication hearing commenced.

M.A. incorrectly argues that the 6-month speedy criminal trial provision, Neb. Rev. Stat § 29-1207 (Reissue 1989), is applicable to this case. She contends that the adjudication hearing in this case was not held within the 6-month time limit directed by the Nebraska Juvenile Code. M.A. is correct in asserting that 335 days elapsed from the time the petition to terminate her parental rights was filed until the adjudication hearing. After deducting time excludable from the 6-month period, there were still 240 days between the filing of the termination petition and commencement of the adjudication hearing, which is well beyond the 6-month period. M.A. concludes that because of the delay in hearing the petition to terminate her parental rights, the petition should have been dismissed. We disagree.

The speedy trial provisions of U.S. Const. amend. VI, Neb.

Const. art. I, § 11, and Neb. Rev. Stat. §§ 29-1205 to 29-1209 (Reissue 1989) apply only to criminal trials. *State v. Bostwick*, 233 Neb. 57, 443 N.W.2d 885 (1989). A proceeding to terminate parental rights is statutorily mandated and brought about to protect a child; it is not criminal in nature. *In re Interest of M.S.*, 218 Neb. 889, 360 N.W.2d 478 (1984) (holding that absent questions which would subject a parent to criminal sanctions, the protections afforded by the fifth amendment privilege against self-incrimination do not apply to parental termination proceedings); *In re Interest of Spradlin*, 214 Neb. 834, 336 N.W.2d 563 (1983) (determining that a parent does not possess a right to have counsel present at interviews between the parent and an expert witness). Thus, it is clear that the speedy trial right guaranteed by the U.S. and Nebraska Constitutions and §§ 29-1205 to 29-1209 does not apply to parental termination proceedings.

The Nebraska Juvenile Code provides that an adjudication hearing be held within a 6-month period after the petition is filed. Neb. Rev. Stat. §§ 43-278 and 43-279.01(1)(f) (Reissue 1988). The 6-month period is to be calculated in the same manner as the 6-month period is calculated in criminal cases under § 29-1207. § 43-278.

Although § 43-278 directs that an adjudication hearing be held within 6 months after a petition is filed, the Legislature has not directed that the case be dismissed, nor has the Legislature forged a remedy that deprives the juvenile court of jurisdiction to adjudicate a parental termination case, in the event that § 43-278 is violated. This is in contrast to the remedy for a violation of a criminal defendant's speedy trial right where the defendant is entitled to an absolute discharge from the offense charged and any other offense required by law to be joined to that offense. See § 29-1207. The question thus arises, What happens in the absence of legislative direction when an untimely parental termination hearing is held?

The Supreme Court of Vermont recently addressed this issue. *In re J.R.*, 153 Vt. 85, 570 A.2d 154 (1989), involved a child who had been sexually abused and placed in the custody and guardianship of the Vermont Department of Social and Rehabilitation Services. After the case was appealed for the

second time and remanded, the trial court failed to conduct a dispositional hearing within the statutory time limits. The parents contended that because the hearing was held in an untimely fashion, the district court erred in not dismissing the case. The *J.R.* court relied on the general rule that "where the statute is merely 'directory'—that is, directs the manner of doing something, but is not the essence of the authority for doing it—compliance with the manner is not considered essential to the validity of the proceeding." *J.R., supra* at 92, 570 A.2d at 157. Thus, the court held that since the statute's time limit was only directory, it was proper not to dismiss the case. In its most recently reported decision on the issue at hand, the Vermont Supreme Court stated that its decisions reflect that the parent's right to a speedy adjudication must be weighed with the child's best interests. See *In re M.C.P.*, 153 Vt. 275, 571 A.2d 627 (1989) (involving a sexually and physically abused child placed in the legal custody of the Vermont Department of Social and Rehabilitation Services).

The rule regarding directory legislation is reflected in the case law of this state, although not in the context of a hearing to terminate parental rights. In *State v. Steele*, 224 Neb. 476, 399 N.W.2d 267 (1987), the defendant was acquitted by reason of insanity and ordered admitted to the Lincoln Regional Center for a 90-day evaluation. Because the State failed to conduct an evidentiary hearing before the expiration of the 90-day period as provided in Neb. Rev. Stat. § 29-3702 (Reissue 1989), Steele argued that the court lacked jurisdiction and that he must be released from the Lincoln Regional Center. Relying on the rule that a provision of a statute which does not relate to the essence of the thing to be done but governs the time or manner of performance is generally considered to be directory as opposed to mandatory, this court held that the statute's time limits were directory, not mandatory. Therefore, Steele was not released from custody.

We were also confronted with the failure to conduct an evidentiary hearing as provided in § 29-3702 in *State v. Hayden*, 233 Neb. 211, 444 N.W.2d 317 (1989). The defendant in *Hayden* claimed that the 90-day evaluation period should be analogized to his right to a speedy trial. Again, this court held

that the time limits set forth in § 29-3702 are directory, not mandatory, and that dismissal of the proceedings was not a proper remedy for a nonprejudicial violation of the statute. In other contexts, it has been determined that a legislative enactment providing that an act be accomplished within a specified time period, with no sanction for failure to comply with that mandate, is directory. See, *In re Interest of S.S.L.*, 219 Neb. 911, 367 N.W.2d 710 (1985) (deciding that the failure of a sheriff to immediately serve parents with notice that their child had been taken into custody under Neb. Rev. Stat. § 43-250 (Reissue 1984) and to file a petition within 48 hours after taking custody of the child as required by Neb. Rev. Stat. § 43-275 (Reissue 1988) did not deprive the county court of jurisdiction); *Local Union No. 647 v. City of Grand Island*, 196 Neb. 693, 244 N.W.2d 515 (1976) (concluding that the statutory provision requiring the Court of Industrial Relations to hear each case within 60 days from the date a petition is filed and to enter an order thereon within 30 days after the hearing is directory and not mandatory).

Based on the foregoing cases, we conclude that the statutory provision requiring that an adjudication hearing be held within 6 months after a juvenile petition is filed is directory, not mandatory. In view of the fact that a juvenile's best interests are primary considerations in a parental termination proceeding, see *In re Interest of J.L.M. et al.*, 234 Neb. 381, 451 N.W.2d 377 (1990), an opposite conclusion might well circumvent this purpose and allow form to prevail over substance. For instance, it would be absurd to return a sexually abused child to the party who abused the child for the sole reason that the hearing was held 181 days after the petition was filed. Section 43-278 governs the time for an adjudication hearing of a juvenile petition and does not relate to the essence of the thing to be done. We agree with the *J.R.* court that although the statutory time limit is directory, the violation of that time limit might, under certain circumstances, prejudice parents in some cases. In this case, M.A. has failed to show how she was prejudiced by the delay in the adjudication hearing. M.A.'s first assignment of error is meritless.

In her second and final assignment of error, M.A. contends

that the State has failed to show by clear and convincing evidence that it was in C.P.'s best interests to terminate her mother's parental rights.

In order to terminate parental rights, it must be shown that termination of parental rights is in the child's best interests and that at least one of six bases provided in § 43-292 exists. Section 43-292 provides:

The court may terminate all parental rights between the parents or the mother of a juvenile born out of wedlock and such juvenile when the court finds such action to be in the best interests of the juvenile and it appears by the evidence that one or more of the following conditions exist:

. . . .

(2) The parents have substantially and continuously or repeatedly neglected the juvenile and refused to give the juvenile necessary parental care and protection.

An order terminating parental rights must be based on clear and convincing evidence. *In re Interest of E.R., J.R., and A.R.*, 230 Neb. 646, 432 N.W.2d 834 (1988). " '[C]lear and convincing evidence means and is that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of a fact to be proved.' " *In re Interest of J.S., A.C., and C.S.*, 227 Neb. 251, 266, 417 N.W.2d 147, 157 (1987). The right of parents to maintain custody of their child is a natural right, subject only to the paramount interest which the public has in the protection of the rights of the child. *In re Interest of M.*, 215 Neb. 383, 338 N.W.2d 764 (1983). A parent's natural right to the custody of his or her own child must yield when the two requirements of § 43-292 have been met. *In re Interest of J.S., A.C., and C.S., supra.* First, there must be clear and convincing evidence of the existence of one or more of the circumstances described in subsections (1) to (6) of § 43-292. *Id.* Second, if one of the conditions prescribed in subsections (1) to (6) has been evidentially established, there must be an additional showing by clear and convincing evidence that termination of parental rights is in a child's best interests. *Id.* "It is a combination of the best interests of the child and evidence of fault or neglect on the part of the parents that is

required." *In re Interest of M.B., R.P., and J.P.*, 222 Neb. 757, 766, 386 N.W.2d 877, 883 (1986).

M.A. herself was brutalized by T.P. She also observed T.P. hit C.P. with a board, stick, and belt and observed him strike C.P.'s face and head. By her own admission, these beatings left marks and bruises on C.P. Despite this firsthand knowledge of T.P.'s violent and abusive propensities, she allowed her child to be placed in his care and custody. Due to M.A.'s neglect, her child was placed in an intolerable situation where she witnessed long-term abuse which resulted in the death of an 18-month-old infant. Moreover, one of the police officers who removed C.P. from T.P.'s home testified that absent the physical abuse, he would still have taken the children because of the unwholesome and unsafe environment in which they were living. A parent's failure to take proper measures to protect children from abuse by another furnishes sufficient cause to terminate parental rights under the statutory subsection at issue. *In re Interest of J.B. and A.P., ante* p. 74, 453 N.W.2d 477 (1990). See, *In re Interest of Hollenbeck,* 212 Neb. 253, 322 N.W.2d 635 (1982); *In re Interest of Cook,* 208 Neb. 549, 304 N.W.2d 390 (1981).

M.A. claims that in addition to the abduction report, she called the police department and Child Protective Services to assist her in obtaining custody of C.P. However, neither the police nor Child Protective Services had records of any of these alleged reports. Though M.A. stated that she did not attempt to obtain custody of C.P. because she was frightened of T.P. "[i]n a way," this does not excuse her conduct. Even if we accept this qualified expression of fear, a mother's fright does not, by itself, excuse her failure to extricate children from a dangerous environment. See *In re Interest of J.B. and A.P., supra.*

There is further evidence that clearly and convincingly establishes that M.A. substantially and continuously or repeatedly neglected C.P. and refused to give C.P. necessary parental care and protection. M.A. declined to visit C.P. for at least a year prior to the events of May 19, 1988. This failure exhibits M.A.'s lack of genuine interest in giving her child the required necessary parental care and protection. It also shows M.A. substantially and continuously for at least a year neglected C.P. In view of the facts that her child lived in the

same city as M.A. and the mother was aware of the child's location, M.A.'s attempts to excuse her failure to visit C.P. are not convincing. Indeed, M.A. testified that she quit visiting the child because she married.

Having determined that there existed clear and convincing evidence of the condition described in § 43-292(2), we next consider whether the record establishes by clear and convincing evidence that it was in C.P.'s best interests to terminate her natural mother's parental rights. There was expert testimony that M.A. suffered from "battered woman's syndrome," a condition of learned helplessness, and had been involved in several abusive relationships prior to and after her relationship with T.P. That syndrome, if untreated, affects a woman's ability to protect her children from abuse and places the children at risk. Although in April 1988 M.A. agreed to obtain treatment for the battered woman's syndrome she suffered, there is no evidence that she had obtained treatment for her malady by the time of the termination hearing on May 3, 1989.

After M.A. and T.P. separated, there were reports to Child Protective Services regarding abuse to M.A.'s other sons, this abuse being committed by a man whom she married after severing her relationship with T.P. A caseworker testified that the abuse reported to Child Protective Services was substantiated.

The evidence that M.A. had been unable or unwilling to protect C.P. in the past and has continued to endanger her other children by engaging in abusive relationships clearly and convincingly establishes that it is in C.P.'s best interests to terminate her natural mother's parental rights. M.A.'s final assignment of error is without merit.

AFFIRMED.