IN RE INTEREST OF A.C., A CHILD UNDER 18 YEARS OF AGE. STATE OF NEBRASKA, APPELLEE AND CROSS-APPELLANT, V. C.C. AND G.C., APPELLANTS AND CROSS-APPELLEES.

478 N.W.2d 1

Filed December 27, 1991. No. 91-322.

Susan Koenig-Cramer for appellants.

Michael D. Wellman, Sarpy County Attorney, and Lawrence D. Gendler for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

FAHRNBRUCH, J.

The adoptive parents of A.C., a 10-year-old female child, appeal the termination of their parental rights by the separate juvenile court of Sarpy County.

The juvenile court entered the termination order after finding (1) that the parents of the child "have substantially and continuously or repeatedly neglected said child and refused to give said child necessary care and protection" and (2) that it is in the best interests of the child for the parental rights to be terminated. We affirm.

We have held that in a parental rights termination case,

> "[o]ur review is de novo on the record, and we are required to reach a conclusion independent of the trial court's findings; however, where the evidence is in conflict, we will consider and may give weight to the fact that the trial court observed the witnesses and accepted one version of the facts over another."

*In re Interest of B.M., ante* p. 292, 475 N.W.2d 909, 910 (1991).

A.C., born October 29, 1980, is the adoptive daughter of appellants, C.C. and G.C., and the biological granddaughter of G.C.

In 1988, upon learning that A.C. had been sexually abused,

the family moved to Sarpy County from Turkey, where C.C. had been stationed in the military. In May of that year, A.C.'s increasingly inappropriate behavior prompted her parents to hospitalize her in Omaha for psychiatric treatment. At that time, she revealed to hospital personnel some details of abuse in the home. Upon her release from the hospital, A.C. was placed in foster care under the supervision of the Department of Social Services (DSS). The record is unclear as to how DSS initially became involved in A.C.'s case.

In June 1988, the State filed a petition which, as amended in August 1988, requested that the juvenile court take jurisdiction of A.C. under Neb. Rev. Stat. § 43-247(3)(a) (Reissue 1988) because A.C. was a "juvenile who is homeless or destitute, or without proper support through no fault of his or her parent, guardian, or custodian . . . ." The parents stipulated to the facts alleged in the amended petition. Based upon the stipulated facts, the juvenile court took jurisdiction of A.C., pursuant to § 43-247(3)(a), and continued her custody with DSS for foster placement. The parents were ordered to cooperate with DSS.

DSS arranged therapy for A.C. and her parents. After two sessions with the therapist, the parents moved to Texas in early 1989 when C.C. retired with pension benefits from the military. A.C. remained in foster care in Nebraska. Thereafter, the parents made no effort to return to Nebraska until July 1990, when a supplemental petition to terminate parental rights was filed, despite a promise from C.C. that he and G.C. would return to Nebraska for monthly visitation with A.C. and for therapy. Although no written plan was ever adopted by the court, this promise was an informal agreement between C.C., his attorney, and DSS. The agreement that C.C. and G.C. would return to Nebraska for therapy was not mandated by the court, and the parents' failure to do so, in and of itself, is not a significant factor in terminating their parental rights in A.C. However, their failure to visit A.C. evidences their lack of interest in and neglect of the child.

A.C.'s parents' lack of interest in the well-being of their daughter was manifested in a number of other ways. There were five separate court hearings regarding A.C. from January 1989 to July 1990. None of those hearings was personally attended

by either parent. One hearing was attended by their counsel. Although three separate visits with A.C. were scheduled, both parents failed to appear at any of them. The parents stipulated that they misappropriated Social Security funds intended for A.C. The record reflects the amount misappropriated was $5,000. In Texas, the parents' phone was disconnected, and DSS had no contact with them for at least 5 months. DSS was unable to contact them by telephone. The evidence reflects A.C. told her therapist and hospital personnel that she had been sexually abused by her adoptive brother, who was also her biological cousin. He remains in the home of C.C. and G.C. A.C. continually expressed fear of returning to the care of her grandmother-adoptive mother.

A.C.'s parents requested that she receive psychiatric treatment in Texas. The recommendations of her therapist and of a Texas social worker who conducted a home study were that A.C. not be returned to her family in Texas. C.C. and G.C. adopted five children who were the natural children of G.C.'s three daughters. Four of the adopted children lived in Texas with C.C. and G.C.

On August 17, 1990, the State filed an amended supplemental petition, requesting that the parental rights of C.C. and G.C. to A.C. be terminated under Neb. Rev. Stat. § 43-292(2) and (6) (Reissue 1988). The petition alleged that "reasonable efforts, under the direction of the court, have failed to correct the conditions leading to the determination" that A.C. was a juvenile under § 43-247(3)(a). The amended supplemental petition also alleged that "[t]he parents have substantially and continuously or repeatedly neglected the juvenile and refused to give the juvenile necessary parental care and protection." See § 43-292(2).

Following an evidentiary hearing on January 24, 1991, attended by C.C. and G.C., their attorney, and A.C.'s guardian ad litem, the juvenile court found that there was clear and convincing evidence that A.C.'s adoptive parents had "substantially and continuously or repeatedly neglected [the juvenile] and refused to give [the juvenile] necessary care and protection . . . ." The juvenile court judge also found by clear and convincing evidence that it was in the best interests of A.C.

that C.C.'s and G.C.'s parental rights be terminated. The judge terminated them under § 43-292(2).

A.C.'s parents claim the juvenile court erred in finding that reasonable efforts, under the direction of the court, had failed to correct the conditions leading to the determination that the child was within the meaning of § 43-247(3)(a). That finding was made upon stipulated facts in the original petition, which was amended in August 1988. The adjudication that a child is within the meaning of § 43-247(3)(a) is a final, appealable order. *In re Interest of L.J., M.J., and K.J.*, 238 Neb. 712, 472 N.W.2d 205 (1991). No appeal was taken from that adjudication. Thus, the appeal of that adjudication is untimely and requires no further discussion. Two other assignments of error were not discussed in the appellants' brief. Errors which are assigned but not argued will not be considered by this court. *In re Interest of B.M., ante* p. 292, 475 N.W.2d 909 (1991).

The parents also assign as error the juvenile court's (1) finding that the parents had substantially and continuously or repeatedly neglected said child and refused to give said child necessary care and protection and (2) failure to consider the reasonableness of the plan, if any, of DSS, which plan failed to take into consideration the parents' geographic location.

In our de novo review of the record, we find that clear and convincing evidence supports the juvenile court's determination that parental rights should be terminated under § 43-292(2). In order to terminate parental rights, it must be shown that termination of parental rights is in the child's best interests and that at least one of six bases provided in § 43-292 exists. *In re Interest of C.P.*, 235 Neb. 276, 455 N.W.2d 138 (1990). Section 43-292 provides:

> [A juvenile court] may terminate all parental rights between the parents . . . and [a] juvenile when the court finds such action to be in the best interests of the juvenile and it appears by the evidence that one or more of the following conditions exist:
>
> . . . .
> (2) The parents have substantially and continuously or repeatedly neglected the juvenile and refused to give the juvenile necessary parental care and protection . . . .

An order terminating parental rights must be based upon clear and convincing evidence. Clear and convincing evidence means and is that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of a fact to be proved. *In re Interest of C.P., supra.*

> A parent's natural right to the custody of his or her own child must yield when the two requirements of Neb. Rev. Stat. § 43-292 (Reissue 1988) have been met. First, there must be clear and convincing evidence of the existence of one or more of the circumstances described in subsections (1) to (6) of § 43-292. Second, if one of the conditions prescribed in subsections (1) to (6) has been evidentially established, there must be an additional showing by clear and convincing evidence that termination of parental rights is in a child's best interests. It is a combination of the best interests of the child and evidence of fault or neglect on the part of the parent that is required.

*In re Interest of N. W. and R. W.,* 238 Neb. 620, 630, 472 N.W.2d 887, 893 (1991).

The evidence of fault or neglect on the part of the parents has been set forth in the above facts. Those facts show clearly and convincingly that the parents substantially and continuously or repeatedly neglected A.C. and refused to give A.C. necessary parental care and protection. In fact, their conduct went beyond neglect of A.C. when they misappropriated $5,000 in Social Security funds which were intended for her benefit.

The evidence is also clear and convincing that termination of parental rights is in the best interests of A.C. A caseworker assigned to A.C. was asked why she believed it would be in the child's best interests to terminate parental rights in this case. She answered,

> [A.C.] has been living in foster care for several years now, she has grown into a very verbal child who is doing well in school, doing well in her children's groups such as Brownies and gymnastics, and she has consistently, since I've managed the case, not wanted to be with her grandparents.

Of particular significance is the testimony of A.C.'s therapist, a clinical psychologist, who opined that it was in

A.C.'s best interests that the adoptive parents' parental rights be terminated. The therapist testified that A.C.'s main fears are "[r]emolestation sexually by a family member, physical abuse from the grandmother. She also has an idea that her grandmother may try to kill her." The therapist diagnosed this then nine-year-old child as suffering from post-traumatic stress syndrome—a syndrome commonly associated with returning Vietnam veterans. A.C. was described by her therapist as a child of above-average intelligence whose behavior improved dramatically with therapy. The therapist testified that, in her opinion, if A.C. were returned to the family, "she'd decompensate psychologically [which] would mean going back to probably the worst of her symptoms thus far, probably compounded by the fact that she'd been abandoned by people that she trusted to keep her safe from that environment."

Similar testimony was given by another caseworker, who stated that after 2 years in foster care "[h]er behavior had stabilized to the point that, according to the foster mother, she only reacted negatively when she was afraid or when there was a discussion about her returning to her family . . . ."

Most disturbing is the continued presence in the family home of A.C.'s adoptive brother. A.C. has consistently maintained that this adolescent boy engaged in inappropriate sexual activity with her. The parents appear inexplicably indifferent to this fact, while for their daughter it remains "one of her main fears."

The requirements of § 43-292(2) having been met by clear and convincing evidence, appellants' first assignment of error is without merit.

The parents also allege error in the court's failure to consider the reasonableness of the plan, if any, of DSS. The essence of their argument is that DSS had no written plan for the family's reunification. This assignment of error is also without merit. A plan for rehabilitation is not a prerequisite or condition precedent to termination of parental rights. *In re Interest of A.H.*, 237 Neb. 797, 467 N.W.2d 682 (1991). A DSS caseworker testified it had been her hope that the parents would return to Nebraska for therapy and to work out a plan regarding visitation with A.C. The parents never returned for either of

those purposes.

Assigning as error the failure of the court to also adjudicate this matter under § 43-292(6), the State has cross-appealed. As we have found that parental rights were properly terminable under § 43-292(2), it is unnecessary for us to reach that issue.

The judgment of the trial court is correct and is affirmed.

AFFIRMED.