IN RE INTEREST OF MARCUS W. ET AL.,
CHILDREN UNDER 18 YEARS OF AGE.
STATE OF NEBRASKA, APPELLEE, V.
ANGELA W., APPELLANT.

649 N.W.2d 899

Filed July 30, 2002.   Nos. A-01-1287, A-01-1295, A-01-1296.

Laurel Heer-Clark and Milo Alexander, of Nebraska Legal Services, for appellant.

James S. Jansen, Douglas County Attorney, and Karen Kassebaum Nelson for appellee.

HANNON, SIEVERS, and MOORE, Judges.

HANNON, Judge.

## INTRODUCTION

Angela W. appeals from an order of the separate juvenile court of Douglas County terminating her parental rights to Gabriella W., Asia W., and Marcus W. Although the case for each child was separately docketed, the cases have been consolidated for purposes of trial and this appeal. On appeal, Angela asserts that the juvenile court erred in failing to apply principles such as collateral estoppel to bar the action; in excluding testimony regarding the status of the parental rights of Greg W., who is Angela's husband and the father of the children and with whom she was residing at the time of the termination; in failing to prove that Angela is unable to discharge her parental duties; and in finding by clear and convincing evidence that the best interests of the children are served by the termination of Angela's parental rights. We affirm the decision of the juvenile court.

## PROCEDURAL BACKGROUND

On December 3, 1997, the court adjudicated Gabriella, born March 1, 1996, as a child within the meaning of Neb. Rev. Stat.

§ 43-247(3)(a) (Supp. 1997). On October 1, 1998, the court adjudicated Asia, born June 27, 1998, as a child within the meaning of § 43-247(3)(a) (Reissue 1998) and found that Angela and Greg had engaged in domestic violence in Asia's presence.

The State filed a motion to terminate the parental rights of Angela and Greg to Gabriella and Asia, alleging that termination was proper under Neb. Rev. Stat. § 43-292(2) (Reissue 1998) because Angela and Greg substantially and continuously or repeatedly neglected and refused to give the children necessary parental care and protection in that they had failed to make sufficient progress to have the children placed with them despite nearly 2 years of intervention by the Nebraska Department of Health and Human Services (DHHS), and under § 43-292(5) because Angela was unable to discharge parental responsibilities because of a mental illness or mental deficiency that was expected to continue for a prolonged indeterminate period of time. At the hearing, the State asked for a continuance regarding the mental deficiency issue because it was unable to locate its chief witness, and the continuance was granted over Angela's objection. At the conclusion of the case, the State's motion to dismiss the count pertaining to § 43-292(5) was granted. In our review of the trial court's findings from the first hearing, we find no mention of evidence regarding mental illnesses or deficiencies.

The court granted the motions to terminate parental rights. The parents appealed, and this court entered a "Memorandum Opinion and Judgment on Appeal" in *In re Interest of Asia W. & Gabriella W.*, 9 Neb. App. xiv (Nos. A-99-669, A-99-729, Mar. 6, 2000). After concluding that the State had not proved by clear and convincing evidence that Angela and Greg had substantially and continuously or repeatedly neglected and refused to provide necessary parental care and protection to their children, this court reversed the juvenile court's order and remanded the matter for further proceedings. This court stated that the parental rights of Angela and Greg should not be terminated, given their efforts and improvements, and specifically referred to testimony indicating that both Angela and Greg made progress in learning appropriate parenting skills and were committed to improving themselves as parents.

On May 10, 2000, Angela and Greg gave birth to Marcus. The court noted in its October 4 order that a neuropsychological assessment on Angela was completed in 1998, but it was never offered into evidence. On November 8, Marcus was adjudicated as a child within the meaning of § 43-247(3)(a). The court found the second amended petition to be true in its entirety, which petition alleged that Angela and Greg engaged in domestic violence in the presence of Marcus, that Greg exhibited inappropriate parenting, and that Angela failed to protect Marcus.

As of July 3, 2001, the permanency objective for each child was reunification. However, the State filed motions to terminate Angela's parental rights on July 24, alleging that termination was proper under § 43-292(5) and was in the best interests of the children. On October 23, a hearing on the motions was held, wherein at the State's request, the court took judicial notice of all its previous orders, the pleadings, notice of previous motions, and notice of appeals and appellate decisions.

## FACTUAL BACKGROUND

Marjorie Padula, a licensed psychologist and neuropsychologist, met with Angela on May 14 and 24, 2001, for testing. Padula testified that in completing the neuropsychological evaluation, she obtained background information from the patient, reviewed collateral information, and then examined various functional parts of the brain, which parts included attention and concentration, memory, higher-level problem solving, motor functioning, and visuospatial abilities. She examined Angela's emotional and cognitive ability to function.

Padula testified that she diagnosed Angela with cognitive dysfunction consistent with frontal lobe impairment, generalized anxiety disorder, and mood disorder with mixed features secondary to frontal lobe dysfunction. Angela told Padula that she had a history of hydrocephalus, a condition where too much cerebral spinal fluid collects on the brain and which required several shunts as she was growing, and that she had a history of seizures. Padula found this significant because seizures can disrupt cognitive functioning and because hydrocephalus is known to impact cognitive ability, specifically frontal lobe functioning. Padula explained that cognitive functioning encompasses a person's

ability to remember, concentrate, and perceive things in three-dimensional space.

Angela reported that in the previous 6 months, she was feeling more stress and was quicker to anger, and Padula said that that spoke to Angela's current emotional distress level. The fact that Angela participated in counseling in high school was also clinically significant because it established a history of difficulty with mental health issues. Angela told Padula that she graduated from high school, had been pretesting for enrollment at the University of Nebraska at Omaha, and was interested in becoming a registered nurse. Angela had never been arrested, but apparently had interacted with legal authorities due to Greg's domestic violence and her children's being removed from the home by Child Protective Services.

Angela was married to Greg on July 10, 1996. At the time of testing, Angela told Padula that her children were ages 4, 2, and 1 and were in foster care, but that she had visitation on Mondays, Wednesdays, and Fridays from 11:30 a.m. to 2:30 p.m. In Padula's opinion, Angela would need assistance for daily living activities which require consistent attention or concentration, such as financial responsibilities, medical decision-making, treatment compliance, and parenting. Padula also testified that Angela would be unable to consistently attend to her own safety and the safety of others. High-stress situations would only further impair Angela's ability to problem solve. Padula therefore concluded that Angela would experience difficulty in discharging her parental responsibilities and that her conditions could be expected to continue unchanged. Although Padula had not observed Angela interact with her children, Padula based her opinion upon the results of the neuropsychological testing she administered and reports of a psychological evaluation and a neuropsychological evaluation, both of which evaluations were completed by others.

One of the tests Padula administered was the Shipley Institute of Living Scale, which showed Angela's estimated IQ to be 73, placing her in the borderline range of intelligence. As to results of other tests, Padula explained that Angela's composite scores indicated a very weak level of attention and concentration. Tests to measure motor functioning showed that Angela had normal

fine motor skills and slightly below expected grip strength, but not low enough to be clinically significant. The results of the Rapid Alternating Movement Clinical Exam were clinically significant because the results showed difficulty learning and sustaining movements, which is a function of the frontal lobe. Several tests showed evidence of frontal lobe dysfunction. Although the results of the Wechsler Memory Scale and the California Verbal Learning Test were not necessarily consistent with frontal lobe dysfunction, both of these tests were designed to measure memory functioning. Tests were administered to measure Angela's higher-level problem solving, and Padula said that Angela was "severely impaired on all the tests of higher level problem solving."

Padula explained that in examining the intellectual functioning composite score, she looks to see if there is a significant split between a patient's verbal and nonverbal abilities so that she can make a decision about whether or not one side of the brain is not functioning as it should be. Padula said that Angela did not have a significant split in her intellectual functioning composite score. Padula said that results showing Angela's IQ to be 73, her verbal ability to be in the 4th percentile, and her abstraction to be in the 11th percentile would not necessarily be a sign of frontal lobe dysfunction. Also, Angela's verbal fluency was at the 7th percentile, and verbal fluency is mediated by the frontal lobes. Padula testified that Angela's results on tests designed to measure memory functioning "would not necessarily be a marker for frontal lobe dysfunction but would be more a marker for how a person is able to hear and retain information. It does have some frontal lobe component but not a marker."

Tests designed to look at personality and emotional functioning showed "clinically significant anxiety and also paranoia or a distrust of others." According to Padula, improperly functioning frontal lobes affect impulse control, concentration, and the ability to initiate and plan in a normal way. Padula observed Angela on the two dates of the evaluations and testified that Angela was very angry, used curse words, was impulsive, and had difficulty paying attention and staying on task. Padula testified that Angela's behaviors were consistent for someone with frontal lobe dysfunction.

Padula specifically said that she was not testifying as to whether terminating Angela's parental rights was in the children's best interests because she did not feel qualified to do that. She was not aware of any services that could be offered to assist Angela with parenting short of having someone present 24 hours a day. Padula said that Angela could learn parenting skills involving rote memory in a low-stress, highly structured, and supervised environment if the tasks were simple and concrete and she had somebody with her to take over if there were interruptions.

Lisa Miller, a protection and safety worker for DHHS, testified that she had been working with Angela and her family since July 2000. Miller understood the nature of the cases to be abuse or neglect with some domestic violence issues. She said that Angela had been receiving and participating in services offered by DHHS since 1996, including supervised visits with her children, family support services, various evaluations, and counseling on assorted issues. In Miller's opinion, DHHS used reasonable efforts to reunify Angela with her children, and Miller was unaware of any additional services which could be offered. She said that it was not feasible to arrange for someone to be with Angela 24 hours a day, 7 days a week, to assist her in parenting.

Miller testified that she observed Angela with her children on only two occasions. Miller's opinion was that the children's best interests would be served by terminating Angela's parental rights, and Miller based her opinion upon safety issues, such as the ability to check the temperature of the food served to the children and whether a child's diaper needed to be changed. She further based her opinion upon whether the children viewed Angela as a caregiver, the age of the children, and the length of time the children had been in foster care placement. Miller stated that the children deserved permanency, since each child was residing in an adoptive placement. The examples of ability to check the temperature of the food and judging whether a diaper needed to be changed were not things Miller had observed, but were examples that she had read in the family support notes and heard from the family support worker.

Since Miller had previously testified that the children deserved a permanent home, she clarified that permanency meant adoption. Miller was asked whether she was aware that the State

was not requesting termination of the parental rights of Greg, the father. The State objected to the question based on relevance, and the court sustained the objection, stating that information concerning the status of Greg's parental rights was irrelevant to the pending matter. An offer of proof was made, wherein Miller testified she was aware the State was not requesting termination of Greg's parental rights.

Miller testified that at the time of the termination hearing in October 2001, Gabriella had been in foster care continuously for 54 months, Asia had been in foster care continuously for 40 months, and Marcus had been in foster care continuously since November 2000 (11 months). Miller also said that if Angela was going to be able to parent her children, she would need to make progress in implementing and using her parenting skills, and that she had not been able to do that.

Angela testified that she had been hired to begin working in December 2001 at Omaha Steaks, that she takes numerous medications for her seizures, and that no one assists her with those medications. She said she has the ability and determination to gain the skills necessary to parent and have a relationship with the children. Angela said that she lives with Greg, who is her husband and the father of the children. Angela further testified that she cooks, cleans, does the laundry and shopping, manages the family's finances, and pays the bills with no assistance. She said she has complied with every order of the court in an attempt to be reunified with her children, that she continues to participate in counseling, and that she recognizes the need for positive support. Angela testified that she knows what to do if she experiences unforeseen difficulties when parenting, knows how to properly change a diaper, and knows how to check the temperature of foods before serving them to the children. Angela stated that if she had some problems with Marcus and nobody was there to help her, she would call the Child Saving Institute, which has a parent assistance line. She testified that she loves her children and wants to parent them.

The court entered orders on October 26, 2001, terminating Angela's parental rights to Gabriella, Asia, and Marcus. The orders stated that "this matter shall be reviewed as previously ordered as to Greg [W.], father." Angela timely appealed the

termination of her parental rights to each child under each docket. In orders filed on March 5, 2002, the separate juvenile court acknowledged that it had received a "Relinquishment of Child by Parents," wherein Greg relinquished his parental rights to Gabriella, Asia, and Marcus.

## ASSIGNMENTS OF ERROR

Angela alleges that the juvenile court erred (1) in failing to consider the findings of this court in a previous opinion in this case under the doctrine of collateral estoppel; (2) in excluding testimony regarding the status of the parental rights of Greg, who is Angela's husband and the father of the children and with whom she was living at the time, on the basis that the testimony was irrelevant; (3) in finding clear and convincing evidence existed to support the termination of Angela's parental rights on the bases that she is unable to discharge parental responsibilities because of a mental illness or mental deficiency and that there were reasonable grounds to believe such condition would continue for a prolonged indeterminate period; and (4) in finding by clear and convincing evidence that the best interests of the minor children were served by the termination of her parental rights.

## STANDARD OF REVIEW

■ Juvenile cases are reviewed de novo on the record, and the appellate court is required to reach a conclusion independent of the juvenile court's findings; however, when the evidence is in conflict, the appellate court will consider and give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over another. *In re Interest of Kiana T.,* 262 Neb. 60, 628 N.W.2d 242 (2001).

■ The applicability of the doctrines of collateral estoppel and res judicata is a question of law. *In re Estate of Wagner,* 246 Neb. 625, 522 N.W.2d 159 (1994).

## ANALYSIS
*Collateral Estoppel, Res Judicata, and Law of Case.*

Angela argues that given the facts of this case, the doctrines of collateral estoppel and the law of the case preclude the State from seeking termination of parental rights under § 43-292(5) after previously being unsuccessful in an effort to terminate

parental rights under § 43-292(2). Initially, we note that these issues were not raised before the juvenile court, and Angela urges us to rule on them as plain error. In the absence of plain error, when an issue is raised for the first time in an appellate court, it will be disregarded inasmuch as a lower court cannot commit error in resolving an issue never presented and submitted to it for disposition. *In re Interest of Natasha H. & Sierra H.*, 258 Neb. 131, 602 N.W.2d 439 (1999).

> Plain error exists where there is error, plainly evident from the record but not complained of at trial, which prejudicially affects a substantial right of a litigant and is of such a nature that to leave it uncorrected would cause a miscarriage of justice or result in damage to the integrity, reputation, and fairness of the judicial process.

*In re Interest of Torrey B.*, 6 Neb. App. 658, 665, 577 N.W.2d 310, 315 (1998). Since a substantial right of Angela is affected by the termination proceedings, we will consider these issues.

■ Under the law-of-the-case doctrine, the holdings of an appellate court on questions presented to it in reviewing proceedings of the trial court become the law of the case; those holdings conclusively settle, for purposes of that litigation, all matters ruled upon, either expressly or by necessary implication. *Mondelli v. Kendel Homes Corp.*, 262 Neb. 263, 631 N.W.2d 846 (2001). The law-of-the-case doctrine operates to preclude a reconsideration of substantially similar, if not identical, issues at successive stages of the same suit. *In re Estate of Stull*, 261 Neb. 319, 622 N.W.2d 886 (2001). Angela's brief points to a number of statements made by this court in the first appeal, as follows:

> "[T]he record reflects that Angela and Greg have always been motivated to learn parenting skills and have in fact made progress in their efforts." . . . "The evidence showed that Angela seemed to be bonding with Asia and appeared capable of furthering her parenting skills." . . .
>
> . . . "The record permits the inference that Angela's learning disabilities have made it hard for her to learn and retain parenting skills; however, there was testimony that Angela and Greg had both made progress in learning appropriate parenting skills." . . . "[Angela] was in continuous

contact with the various people who were working with her and Greg on parenting skills." . . .

. . . "During the 1999 sessions, [a] Dr. Matthews observed that Angela and Greg were using the skills they had learned in their previous sessions in 1997 and 1998." Brief for appellant at 18-19. These issues were, by their nature, findings of fact based upon conditions prior to the date of the hearing in the trial court. They could not bind the court on facts occurring after that date. After reviewing this court's prior opinion, we do not feel that the law-of-the-case doctrine precludes considering the issue of the existence of a mental illness or deficiency at the time of the second hearing, since it does not appear that that same issue or even a substantially similar issue was being reconsidered. In short, the law-of-the-case doctrine does not apply for essentially the same reasons that the doctrines of res judicata and issue preclusion do not apply, as discussed below.

Res judicata bars relitigation of any right, fact, or matter directly addressed or necessarily included in a former adjudication if (1) the former judgment was rendered by a court of competent jurisdiction, (2) the former judgment was a final judgment, (3) the former judgment was on the merits, and (4) the same parties or their privies were involved in both actions. *State on behalf of Hopkins v. Batt*, 253 Neb. 852, 573 N.W.2d 425 (1998). In order that a judgment be final for res judicata purposes, the order must be such as puts an end to the particular litigation or definitely puts the case out of court. *Osborne v. Stanfield*, 7 Neb. App. 902, 586 N.W.2d 670 (1998). Whether the same cause of action is raised in a subsequent suit is determined by whether the right sought to be vindicated rests upon the same operative facts as that in the prior suit. See *Farmers State Bank v. Germer*, 231 Neb. 572, 437 N.W.2d 463 (1989). Res judicata operates to generally bar every question which was or might have been presented and determined in the first action. See *Sidel v. Spencer Foods*, 215 Neb. 325, 338 N.W.2d 616 (1983).

In *In re Interest of V.B. and Z.B.*, 220 Neb. 369, 372, 370 N.W.2d 119, 121 (1985), the Nebraska Supreme Court applied the following reasoning to parental termination cases:

"A custodial order is conclusive as to all matters prior to its promulgation. But the doctrine of res judicata cannot

settle a question of a child's welfare for all time to come; it cannot prevent a court at a subsequent time from determining what is best for the children at that time. The usual way of expressing this rule is to say that 'circumstances have changed' when the order is no longer in the children's interest."

(Quoting *Marez v. Marez*, 217 Neb. 615, 350 N.W.2d 531 (1984).)

In *In re Interest of V.B. and Z.B.*, the State's motion to terminate parental rights was denied in 1983, and another such motion was filed and granted in 1984. The court explained that it would have been barred from using evidence prior to the 1983 order as the sole basis for terminating parental rights, but that it could correctly use evidence from the time period prior to the 1983 order in conjunction with evidence from the time period after the 1983 order in determining that there was a change of circumstances or lack thereof in the conditions needed to terminate the parental rights. That court stated:

> In determining whether a change of circumstances exists so as to modify a juvenile court's previous order to a decision terminating parental rights, the court can use the time period prior to the previous order in conjunction with the time period after the previous order to determine whether there is a requisite change of circumstances since the original disposition order. [Citation omitted.] When a second termination proceeding is not itself barred, the proof is not limited by res judicata or collateral estoppel principles to facts or evidence which was not considered in, or which came into being after, the first proceeding.

*Id.* at 372, 370 N.W.2d at 122.

In the case before us, the State has to prove that Angela has a mental illness or deficiency that is expected to continue for a prolonged indeterminate time. In the prior termination action, the State had to prove that Angela substantially and continuously or repeatedly neglected and refused to give the children necessary care and protection because she failed to make sufficient progress despite the intervention by DHHS. Although any proof of Angela's mental deficiency could have been presented in the first termination action, the operative facts for the two termination proceedings are different, and different proof would be required in

each proceeding. Therefore, different grounds for termination are involved, and res judicata does not bar this proceeding.

Collateral estoppel applies when an issue of ultimate fact has been determined by a final judgment, and that issue cannot again be litigated between the same parties in a future lawsuit. *Pipe & Piling Supplies v. Betterman & Katelman*, 8 Neb. App. 475, 596 N.W.2d 24 (1999). There are four conditions that must exist for the doctrine of collateral estoppel to apply: (1) The identical issue was decided in a prior action, (2) there was a judgment on the merits which was final, (3) the party against whom the rule is applied was a party or in privity with a party to the prior action, and (4) there was an opportunity to fully and fairly litigate the issue in the prior action. *Thomas Lakes Owners Assn. v. Riley*, 9 Neb. App. 359, 612 N.W.2d 529 (2000). Angela argues that all four conditions have been met in this case and that although the issue was not framed in the same language, "[i]n the first termination trial the State essentially alleged that [Angela] would not or at least did not adequately care for her children. In the second it alleges that she cannot adequately care for them." Brief for appellant at 17-18.

Our first inquiry under collateral estoppel is whether the issues are identical.

> "A former verdict and judgment are conclusive only as to the facts directly in issue, and do not extend to facts which may be in controversy, but which rest on evidence and are merely collateral. It must appear that the matter set up as a bar was in issue in the former case. The test as to whether the former judgment is a bar generally is, whether or not the same evidence will sustain both the present and the former action."

*Suhr v. City of Scribner*, 207 Neb. 24, 27, 295 N.W.2d 302, 304 (1980). When different proof is required, a judgment in the former action is not a bar to the subsequent action. See *id.* Proof of a mental illness or mental deficiency, which is necessary in this action, was not required in the first action where the State sought to prove that Angela substantially and continuously or repeatedly neglected and refused to give the children necessary care and protection because she failed to make sufficient progress despite the intervention by DHHS. Since the first element of collateral

estoppel has not been met, we need not discuss the other elements. See *Kelly v. Kelly*, 246 Neb. 55, 516 N.W.2d 612 (1994) (appellate court is not obligated to engage in analysis which is not needed to adjudicate case and controversy before it).

We also note that the first such motion to terminate parental rights concerned only Gabriella and Asia, and not Marcus. Further, the evidence in the instant termination trial was largely based upon Padula's neuropsychological evaluation which was conducted in May 2001, over a year after this court's decision regarding the first motion for termination.

In Angela's reply brief, her counsel correctly points out that the State did proceed under § 43-292(5) at the first termination trial. The State asked for a continuance regarding that issue because it was unable to locate its chief witness, and the court granted a continuance over Angela's objection. At the conclusion of the case, the court granted the State's motion to dismiss the count pertaining to § 43-292(5). Angela's counsel argues that there is no change of circumstances, since the State was aware of a mental deficiency prior to the first trial. In our review of the trial court's findings from the first hearing, we find no mention of testimony regarding mental illnesses or deficiencies. Although the State had "an opportunity to fully and fairly litigate the issue in the prior action" but did not avail itself of it, we have concluded that the instant action is not barred.

All the statutory grounds for termination set forth in § 43-292 in existence at the time of filing a motion to terminate parental rights should be brought together. The instant case does not appear to be a situation where the State lost the first action and immediately moved to terminate upon a different ground. The grounds for termination under § 43-292(2) for neglect are frequently proved, at least in part, by numerous minor acts over a period of time. The manifestation of the mental illness or deficiency required to justify termination under § 43-292(5) is also frequently observed over a long period of time. At what point a sufficient number of events to evidence the grounds for termination under these subdivisions has been met is a matter of judgment, but by their very nature, if these grounds truly exist, the State's case will get stronger as time passes. An action which is perhaps prematurely brought should not function to keep the

child in a bad situation for his or her entire childhood. To hold otherwise would pervert our paramount concern of protecting the best interests of the child.

*Exclusion of Evidence.*

Angela argues that the juvenile court erred in excluding, on the basis of relevancy, evidence that there was no pending motion to terminate the parental rights of Greg. While the Nebraska Evidence Rules do not apply in parental rights termination cases, due process requires that fundamentally fair procedures be employed. *In re Interest of D.S. and T.S.*, 236 Neb. 413, 461 N.W.2d 415 (1990). We conclude that this evidence should have been admitted, and we will therefore consider it in our de novo review. We note, however, that this fact is not controlling.

The State argues that any issue of Greg's parental rights is now moot because a supplemental transcript in this matter contains an order filed on March 5, 2002, in which the juvenile court acknowledged the receipt of a "Relinquishment of Child by Parents," wherein Greg relinquished his parental rights to each child. A bill of exceptions is the only vehicle for bringing evidence before an appellate court; evidence which is not made a part of the bill of exceptions may not be considered. *State v. Bell*, 242 Neb. 138, 493 N.W.2d 339 (1992). Since this relinquishment was not contained in the bill of exceptions, we do not consider that fact in our de novo review of the evidence.

*Statutory Grounds for Termination of Parental Rights.*

Angela contends the court erred in finding that the State met its burden regarding the statutory grounds for termination of parental rights under § 43-292(5). Before parental rights may be terminated, the evidence must clearly and convincingly establish the existence of one or more of the statutory grounds permitting such and that such is in the juvenile's best interests. *In re Interest of Natasha H. & Sierra H.*, 258 Neb. 131, 602 N.W.2d 439 (1999). Thus, in the instant case, the State's burden was to prove by clear and convincing evidence that Angela was unable to discharge parental responsibilities because of a mental illness or mental deficiency and that there were reasonable grounds to believe that such a condition would continue for a prolonged indeterminate period. See, *id.*; § 43-292(5). Clear and convincing

evidence is that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of a fact to be proved. *In re Interest of Constance G.*, 254 Neb. 96, 575 N.W.2d 133 (1998).

Padula's testimony is set forth in detail above. She observed some behaviors consistent with frontal lobe dysfunction and some that were not necessarily consistent. Padula diagnosed Angela with cognitive dysfunction consistent with frontal lobe impairment. Padula explained that "[w]hen a person's frontal lobes are not working correctly . . . they don't have the same impulse control. They aren't able to initiate and plan in a way that would be what you would consider normal. They aren't able to inhibit outbursts." In Padula's opinion, the frontal lobe dysfunction would not change and Angela would "continue to have difficulty with attention and concentration, with planning, with organization, with following through." Padula opined that Angela would not be able to consistently attend to the safety of others based upon Angela's history of being in situations where she had not been safe. Based upon the diagnoses, Padula said that without having someone there with Angela, it would be difficult for Angela to be able to perform tasks which require shifting her mental set, and that she could learn simple repetitive things in a highly structured and supervised environment, but that Angela probably could not "wean" herself from the person standing next to her over time, especially if there was a high-stress situation. Padula said that the frontal lobe disorder she diagnosed Angela with would be a mental disease or defect that would significantly affect her ability to parent the children.

This case presents a much more difficult decision on the propriety of termination than most such termination cases we have reviewed. The evidence includes a diagnosis of frontal lobe impairment by Padula, a licensed psychologist and neuropsychologist, whose testimony regarding her observations and test results of Angela were not always consistent with her diagnoses. Padula said that Angela would need assistance for tasks that require higher-level problem-solving ability, such as financial responsibilities, medical decisionmaking, and treatment compliance. Angela testified that she is responsible for administering and filling her own medications, cooking, cleaning, doing laundry,

shopping, managing finances, and paying bills, and that she could do those things without assistance.

Padula testified that Angela could learn simple repetitive tasks in a low-stress environment, if it was highly structured and supervised. Her testimony was rife with discussion of "difficulties" with certain tasks that Angela would face. In that sense, our analysis would be much easier if the State's burden was to prove that it would be "difficult" for Angela to discharge parental responsibilities, rather than "unable" as called for in the statute.

We found the case of *In re Interest of C.A.A. and V.S.A.*, 229 Neb. 135, 425 N.W.2d 621 (1988), to be helpful in our determination. That case concerned a mother diagnosed with borderline intellectual ability and dependent personality disorder. The court noted the psychologist's opinion that the mother's mental condition would continue for a prolonged indeterminate period and that she would essentially need to have someone acting in a parental role for her in order for the children to be without danger. The Nebraska Supreme Court affirmed the termination pursuant to § 43-292(5) (Reissue 1984), stating: "Although termination of parental rights may sometimes appear cruel or harsh, experience has shown that failure to terminate parental rights in appropriate cases simply punishes the child for the uncorrectable deficiencies of the parents, thereby extending the same problems and conditions into successive generations." 229 Neb. at 138-39, 425 N.W.2d at 623.

Like in *In re Interest of C.A.A. and V.S.A.*, the expert testimony in this case was that Angela's condition would continue unchanged and that she would need someone around at all times in order to keep her on task and for the children to be safe. It is difficult to terminate the parental rights of someone who we believe truly loves her children, who appears to have consistently complied with the numerous orders of the juvenile court, and who has had this proceeding brought against her through no fault of her own. However, we find that the State has proved by clear and convincing evidence that Angela is unable to discharge her parental responsibilities because she suffers from a mental defect that is expected to last for a prolonged indeterminate period of time.

*Best Interests.*

Finally, Angela argues that the State did not meet its burden in showing that termination of her parental rights was in the children's best interests. In order to terminate parental rights, the State must also prove by clear and convincing evidence that termination is in the child's best interests. See *In re Interest of Clifford M. et al.*, 261 Neb. 862, 626 N.W.2d 549 (2001).

The evidence in this case establishes that at the time of the termination hearing in October 2001, Gabriella at age 5 had been in foster care continuously for 54 months, Asia at age 3 had been in foster care continuously for 40 months, and Marcus at age 1 had been in foster care continuously for 11 months. Miller testified that the children do not view Angela as a caregiver, that the children are very young, that all the children have been in foster care for significant portions of their lives, and that each was residing in an adoptive placement.

Miller's opinion that the children's best interests were served by terminating Angela's parental rights was based upon Angela's not making progress in implementing and using her parenting skills and upon safety issues, such as the ability to check the temperature of the food served to the children and whether a child's diaper needed to be changed. Angela testified that she knows when to change a diaper and knows how to check food to see if it is too hot. When the evidence is in conflict in juvenile cases, the appellate court will consider and give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over another. *In re Interest of Kiana T.*, 262 Neb. 60, 628 N.W.2d 242 (2001).

Padula testified that Angela would need someone with her 24 hours a day, 7 days a week, to assist with parenting. Miller testified that Angela needed prompting to attend to the children, that Angela is unable to maintain the children's safety without someone there telling her what to do, that it was not feasible to put somebody in Angela's home for every hour of every day, and that there were no services that DHHS could offer Angela to assist in reunifying with her children. Thus, the fact that the State was not seeking to terminate Greg's parental rights would be relevant, because Angela testified she was living with Greg, who is her husband and the father of the children. However, the evidence

falls short of providing significant help to Angela's case because the offer of proof did not show that Greg was ready, willing, or able to assist Angela in discharging parental duties. Moreover, Padula and Miller both alluded to domestic violence issues, and the trial court's orders found certain petitions alleging domestic violence and inappropriate parenting by Greg to be true in their entirety. We find there is no reasonable expectation that Greg would provide the assistance needed by Angela.

The termination of parental rights should be used only as a last resort. *In re Interest of M.M., C.M., and D.M.*, 234 Neb. 839, 452 N.W.2d 753 (1990). Angela's children are all still young and have spent most of their lives in foster care. A child cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Lisa W. & Samantha W.*, 258 Neb. 914, 606 N.W.2d 804 (2000). Although there is no evidence of any harm having yet befallen the children, "a court need not await certain disaster to come into fruition before taking protective steps in the interest of a minor child." *In re Interest of S.L.P.*, 230 Neb. 635, 639, 432 N.W.2d 826, 830 (1988). Angela has been receiving services from DHHS since 1996 in hopes that she would be reunified with her children. Miller testified that there were no further services DHHS could offer Angela to assist in reunifying with her children. The fact that Angela has persisted over so many years in trying to learn the necessary skills to care for her children makes a determination that she is unfit very difficult. However, the evidence is clear and convincing that she does not have the mental ability to do so, in spite of her admirable efforts. "When a natural parent suffers from a mental deficiency and cannot be rehabilitated within a reasonable period of time, the best interests of the children require that a final disposition be made without delay." *In re Interest of D.A.B. and J.B.*, 240 Neb. 653, 657-58, 483 N.W.2d 550, 553 (1992). We therefore conclude that the best interests of the children call for the termination of Angela's parental rights.

## CONCLUSION

Upon a de novo review, we conclude there is clear and convincing evidence that Angela's parental rights should be terminated pursuant to § 43-292(5) (Reissue 1998) and that

termination is in the best interests of the children. The judgment of the juvenile court is therefore affirmed.

AFFIRMED.