IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**

IN RE INTEREST OF ASHE G.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF ASHE G., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,
V.
TRACY G., APPELLANT.

Filed April 23, 2013.    No. A-12-748.

Appeal from the County Court for Buffalo County: GERALD R. JORGENSEN, JR., Judge. Affirmed.

Michael W. Baldwin for appellant.

Mandi J. Amy, Deputy Buffalo County Attorney, for appellee.

Loralea L. Frank, guardian ad litem for Ashe G.

SIEVERS, PIRTLE, and RIEDMANN, Judges.

RIEDMANN, Judge.

INTRODUCTION

Tracy G. appeals from the decision of the county court for Buffalo County, sitting as a juvenile court, terminating her parental rights to her minor child, Ashe G. After our de novo review of the trial court record, we affirm.

BACKGROUND

Ashe, born in January 2006, is the biological son of Tracy and Reece S. Tracy has two older children fathered by another man. The following events took place in Kearney, Buffalo County, Nebraska.

On January 29, 2010, Tracy's two older children and Ashe were removed from Tracy's care when police came to the home and discovered its filthy condition. The children were later

- 1 -

adjudicated to be children within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2008). Ashe was placed with foster parents, and one of Tracy's older children was placed with her father. During the pendency of this case, a parenting plan was developed so that Tracy's older children would continue to live with their father, subject to Tracy's parenting time. Thus, the case regarding Tracy's older children was closed, and Ashe is the only child subject to these proceedings. The State moved to terminate Tracy's parental rights to Ashe on February 1, 2012. The termination hearing was held on May 15 and 21.

On March 4 and April 8, 2010, Tracy underwent a psychological evaluation. The evaluation was performed by Thomas Maxson, who is a licensed mental health practitioner and holds a psychological associate license, which allows him to perform psychological evaluations under the supervision of a clinical psychologist. The evaluation was supervised by a clinical psychologist, Dr. Michael Burke. Maxson diagnosed Tracy with depressive disorder, mild mental retardation, and mild cognitive impairment. Tracy was in special education classes in high school but graduated in 1992. She was involved in a car accident in approximately 2002 from which it is believed she suffered a traumatic brain injury that further affected her memory and cognitive functioning.

Maxson performed an IQ test on Tracy, and her IQ was measured at 63. An average IQ score is 100, and anything lower than 70 is considered mental retardation. On a scale of 1 to 100 assessing functioning, Tracy scored a 55. An average well-functioning person will generally score 80 or greater. Maxson testified at the termination hearing that the conditions Tracy suffers from would be classified as a mental illness and mental deficiency.

Maxson opined that Tracy's mild mental retardation combined with the traumatic brain injury affected her adaptive functioning, suggesting the difficulty with maintaining her home, paying bills on a consistent basis, seeking support, and following through on day-to-day obligations. He testified that Tracy's difficulties would continue for the foreseeable future, and he stated, "By definition, intellectual functioning does not change dramatically through a person's adult life."

Furthermore, Maxson's postevaluation report indicates that Tracy will likely continue to have some degree of functional deficits in the day-to-day care of her personal business affairs, maintaining employment, and completing tasks that require multiple steps and extensive memory recall. He opined that Tracy will likely need someone to assist her on a weekly basis to ensure she is keeping up with her bills and other obligations. Maxson indicated that it would seem that Tracy's home became in the condition it was in not because of a disregard for the welfare of her children, but more due to unawareness that it was as bad as it was and a lack of ability to make significant changes once the condition deteriorated.

Maxson recommended that Tracy undergo a medication assessment, but Tracy told him she was unwilling to consent to medication at all. Despite Tracy's initial reluctance, she met with a psychiatric advanced practice registered nurse (APRN) regarding medication in May 2010. The APRN diagnosed her with major depressive disorder, moderate, and prescribed Paxil, an antidepressant. Tracy met with the APRN again a month later, but she had not yet filled the Paxil prescription. The APRN encouraged her to do so, and Tracy filled the prescription that same day. However, she has been inconsistent in taking the medication. For example, when Tracy refilled

her prescription on January 24, 2011, she was given a 30-day supply. She did not refill it again until June 30.

At the termination hearing, her APRN testified that while Tracy has been taking Paxil, she has reported improvements, and that he considers her depression to be in partial remission. He admitted that although the medication is causing remission now, there is no way to predict what would happen if her medication was discontinued.

The case plan goals for Tracy to have Ashe returned to her care were to manage her mental health in order to effectively parent Ashe and identify and learn what it meant to have a safe home and hygiene for herself and Ashe. The testimony at the termination hearing revealed that Tracy would make some improvements and then backtrack. Her counsel described it at the hearing as taking "two steps forward and . . . one step back." She was never able to consistently meet her cleaning goals, and her home would improve but then get cluttered again. She also had a continuing problem with ants and a foul odor in her home.

Tracy had difficulties paying her bills on time. At one point, she fell far behind on her rent and her father had to pay it for her so she would not lose her trailer. She also had her utilities shut off on several occasions. Tracy lost the employment she had at the time her children were removed, which led to her falling behind on bills. However, she found a new job several months later, which she still had at the time of the termination hearing.

Tracy began seeing a therapist in January 2011, but she was not consistent in her attendance. As a result, the therapist discharged Tracy in September, determining that no more progress could be made as Tracy was not open to treatment. Tracy also struggled with attendance at other appointments and meetings, her ability to follow through on suggestions and recommendations, and her behavior.

One of the visitation supervisors and Tracy's guardian ad litem both described Tracy's behavior as "erratic." Tracy would yell at visitation aides and call them names. She failed to show up for some visits or would change the location and then take 30 minutes to arrive at the new location. If Tracy did not have issues with the visitation aides, the visits generally went well. She would bring food and toys for Ashe and would engage and play with him. They were appropriately affectionate with each other and appeared to enjoy their time together. Tracy had some issues with giving in to anything Ashe wanted, however, and not being able to redirect him when necessary. A reward/consequence behavior plan was developed for Ashe to help improve his behavior at school and at his foster parents' house, but Tracy would not always follow through with that and would give Ashe treats even when he did not have good days.

Ashe was 4 years old at the time he was removed from Tracy's care. He underwent an evaluation and some counseling and was diagnosed with disruptive behavior disorder. He would throw tantrums that were more intense and lasted longer than was normal for a 4-year-old. He would also wet the bed and engage in repetitive behavior such as asking the same question over and over, sometimes for hours or days on end. He appeared to lack age-appropriate verbal and social skills at that time as well.

After several months of working with his counselor and his foster parents, Ashe showed remarkable improvement in his ability to verbalize his wants, comply with rules, and control his temper. Ashe's foster mother testified at the hearing that Ashe needs routine, structure, and

predictability in his life and that when he has that, he does well. She testified that at the time of the hearing, his behavior was essentially that of an average child his age.

In November 2010, Ashe went to live with his father, Reece, in Blair, Nebraska. When Ashe arrived at Reece's home, his behavior regressed. He displayed some aggression and anger, would wet the bed and throw tantrums, and seemed to lack any concept or understanding of basic emotion. Ashe continued therapy with a new counselor, and Reece and his wife were very consistent and involved in the therapy sessions. Eventually, Ashe's behavior improved, particularly during a 5-week period where Ashe did not have any visits with Tracy. But once the visits resumed, all of his behaviors returned. In July 2011, Reece returned Ashe to his foster parents' house because he and his wife could not deal with Ashe's behaviors any longer. Both Ashe's foster mother and Reece testified that Ashe's behaviors would return and regress after visits with Tracy.

Tracy initially had visits with Ashe once a week for 2 hours. They were eventually increased to 3 hours per visit. When Ashe moved to Blair, he and Tracy would meet in Lincoln, Nebraska, for visits every other weekend. When Ashe moved back to Kearney, the visits resumed to once a week for 3 hours. In December 2011, visits were increased to three times a week for 3 hours each. However, this only lasted until the end of January, and then they were decreased back to once a week for 3 hours. Tracy agreed to the reduction, stating that she thought three times a week was too much for Ashe and that he could not handle it. The visits were always supervised.

The evidence presented at the termination hearing established that over the more than 2-year period that Ashe had been out of Tracy's home, Tracy made no real, measurable improvements in her goals. Tracy's guardian ad litem testified at the termination hearing that Tracy was still struggling with caring for herself on a day-to-day basis, providing for herself with budgeting, and keeping her house clean.

Several witnesses testified that with guidance, help, and support, Tracy may be able to care for herself, but the witnesses expressed concern about Tracy's ability to parent a young child, who has certain needs of his own, on a full-time basis. An outpatient therapist who met with Tracy for seven or eight sessions, testified she believed that with supportive people or agencies in place, Tracy would be able to parent Ashe. A visitation supervisor who worked with Tracy and Ashe from December 2010 through the date of the termination hearing stated that she did not think Tracy would be able to handle Ashe and meet his needs on a full-time basis without someone to guide her as to what to do. Christina Ledesma, the Department of Health and Human Services caseworker who had been working with Tracy since February 2010, testified that because Tracy had been inconsistent in caring for her own mental health needs, she was concerned about Tracy's ability to parent a child that also has needs, has behavioral issues, and requires educational assistance. She stated she did not believe that Tracy would be able to parent Ashe full time.

Ultimately, Ledesma opined that terminating Tracy's parental rights would be in Ashe's best interests for several reasons. First, she does not believe that Tracy can successfully parent Ashe into his adulthood because she requires assistance to simply take care of herself. In addition, Ashe needs and deserves a home where he can have permanency and be taken care of and where he has parents that can provide for him and all of his needs instead of him assisting

the parent. By terminating Tracy's parental rights, Ledesma testified that Ashe would be gaining a stable, structured, and loving home that would provide for all of his needs.

Tracy's guardian ad litem testified that Tracy needs to be able to take care of herself, and at the time of the termination hearing, she has not seen evidence that Tracy was capable of that. For that reason, she believed that terminating Tracy's parental rights would be in Ashe's best interests. In a report dated about 7 months before the termination hearing, Ashe's guardian ad litem agreed, writing, "I am fearful that reunification will never be in Ashe's best interests."

At the end of the hearing, Reece relinquished his parental rights to Ashe. In a subsequent order, the court terminated Tracy's parental rights to Ashe. The court found that Ashe had been out of Tracy's home for 27 consecutive months and visits must still be supervised because of Tracy's inability to properly parent Ashe on her own. The court stated, "While it is abundantly clear that [Tracy] loves Ashe, she simply has not demonstrated an ability to parent him nor given any indication that she will gain that ability in the foreseeable future." Ultimately, the court found termination would be in Ashe's best interests, stating, "While all children need stability and structure, it is clear from the evidence that Ashe needs even more stability, structure, and routine than the average child and [Tracy] is simply not able to provide that nor does this court feel she ever will be." Tracy now appeals.

## ASSIGNMENTS OF ERROR

Tracy alleges, summarized and renumbered, that the juvenile court erred (1) in finding that the State had proved grounds for termination under Neb. Rev. Stat. § 43-292(5), (6), and (7) (Cum. Supp. 2012) by clear and convincing evidence, and (2) in finding that termination of Tracy's parental rights is in Ashe's best interests.

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of Angelica L. & Daniel L.*, 277 Neb. 984, 767 N.W.2d 74 (2009). However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the trial court observed the witnesses and accepted one version of the facts over the other. *Id*.

## ANALYSIS

*Grounds for Termination.*

The bases for termination of parental rights are codified in § 43-292. Section 43-292 provides 11 separate conditions, any one of which can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child. *In re Interest of Sir Messiah T. et al.*, 279 Neb. 900, 782 N.W.2d 320 (2010).

The State moved to terminate Tracy's parental rights to Ashe under § 43-292(5), (6), and (7). In its order terminating Tracy's parental rights, the court did not identify which subsections it was addressing. However, the court found that Tracy suffers from mental illness and mental deficiency and had not demonstrated an ability to parent Ashe or given any indication that she will gain that ability in the foreseeable future (§ 43-292(5)). The court also found that Ashe had

been in out-of-home placement for 15 or more months of the most recent 22 months (§ 43-292(7)).

Section 43-292(5) allows termination of parental rights if "[t]he parents are unable to discharge parental responsibilities because of mental illness or mental deficiency and there are reasonable grounds to believe that such condition will continue for a prolonged indeterminate period." The evidence reveals that Tracy suffers from mental illness and mental deficiency that have plagued her since at least high school and were exacerbated by the car accident approximately 10 years ago. Maxson's testimony at the termination hearing establishes that Tracy's conditions will continue for an indeterminate period of time. Even with State-provided assistance and services during the 27 months Ashe was out of Tracy's care, Tracy never made significant, lasting improvements in her ability to care for herself, let alone her ability to parent a child who needs stability, structure, and routine.

In *In re Interest of Marcus W. et al.*, 11 Neb. App. 313, 649 N.W.2d 899 (2002), we affirmed termination of a mother's parental rights based on a diagnosis similar to Tracy's. The mother was diagnosed with cognitive dysfunction consistent with frontal lobe impairment and had an IQ of 73. The mother's psychologist testified at the termination hearing that the mother's conditions would continue unchanged and that she would need assistance for daily activities which require constant attention or concentration, such as financial responsibilities, medical decisionmaking, treatment compliance, and parenting. She also stated that the mother would continue to have difficulty with attention and concentration, planning, organization, and following through.

This court upheld termination of the mother's parental rights based on the facts that her condition would continue unchanged and that she would need someone around at all times in order to keep her on task and for the children to be safe. In reaching our decision, we cited *In re Interest of C.A.A. and V.S.A.*, 229 Neb. 135, 425 N.W.2d 621 (1988), noting that in that case, testimony established that due to the mother's mental condition, she would essentially need to have someone acting in a parental role for her.

Similarly, in this case, the evidence is clear that Tracy's condition will continue unchanged and that she continues to struggle in her day-to-day functions even with supportive people acting in a "parental role" for her. Tracy was never able to keep her home consistently clean, and visits had to be moved out of her home because of its condition. Tracy's attendance at therapy sessions was inconsistent, and she did not take her medication as directed. She never made substantial progress on her case plan goals. We agree with the trial court's observation that "it is abundantly clear that [Tracy] loves Ashe, but she simply has not demonstrated an ability to parent him nor given any indication that she will gain that ability in the foreseeable future."

Tracy argues that Maxson's evaluation and opinions of her should be discounted because he saw her on only two occasions more than 2 years ago. She claims that because Maxson never conducted a later evaluation of her, she was denied the opportunity to show that she had made headway in confronting her depression. We first note that the initial psychological evaluation was conducted in 2010, at the beginning of this case. The results of the evaluation helped determine Tracy's case plan goals and what services should be provided to her.

Although Maxson diagnosed Tracy with depressive disorder, he concluded that it was the mild mental retardation combined with the traumatic brain injury that have caused her difficulty

in maintaining her home and finances and difficulty following through on daily obligations. This mental deficiency has been present at least since Tracy was in high school and is not expected to improve because, as Maxson indicated, intellectual functioning does not change dramatically through adult life. Further evidence that Tracy's condition had not changed is shown by the fact that during the pendency of the case, Tracy continued to struggle with keeping her home clean and free of clutter, with keeping meetings and appointments, and with following through on her mental health care. Giving weight to the fact that the juvenile court observed Maxson and accepted his opinions, we find Tracy's argument without merit.

Our de novo review of the record clearly and convincingly shows that grounds for termination of Tracy's parental rights under § 43-292(5) were proved by sufficient evidence.

If an appellate court determines that the lower court correctly found that termination of parental rights is appropriate under one of the statutory grounds set forth in § 43-292, the appellate court need not further address the sufficiency of the evidence to support termination under any other statutory ground. *In re Interest of Justin H. et al.*, 18 Neb. App. 718, 791 N.W.2d 765 (2010). Therefore, this court need not review termination under § 43-292(6) or (7). Once a statutory basis for termination has been proved, the next inquiry is whether termination is in the child's best interests.

*Best Interests.*

Tracy argues that the juvenile court erred in finding that terminating her parental rights was in Ashe's best interests. Section 43-292 requires that parental rights can be terminated only when the court finds that termination is in the child's best interests. A termination of parental rights is a final and complete severance of the child from the parent and removes the entire bundle of parental rights. See *In re Interest of Crystal C.*, 12 Neb. App. 458, 676 N.W.2d 378 (2004). Therefore, with such severe and final consequences, parental rights should be terminated only "'[i]n the absence of any reasonable alternative and as the last resort . . . .'" See *In re Interest of Kantril P. & Chenelle P.*, 257 Neb. 450, 467, 598 N.W.2d 729, 741 (1999). However,

> Where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights. *In re Interest of Andrew M. et al.*, 11 Neb. App. 80, 643 N.W.2d 401 (2002). Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Phyllisa B.*, 265 Neb. 53, 654 N.W.2d 738 (2002).

*In re Interest of Stacey D. & Shannon D.*, 12 Neb. App. 707, 717, 684 N.W.2d 594, 602 (2004).

The evidence reveals that Ashe was originally placed in the custody of the State in January 2010. Despite the numerous services offered to Tracy to help her manage her mental deficiencies and assist in her day-to-day responsibilities, Tracy made very little progress. As of the date of the termination hearing, Tracy's visits were still only once a week for 3 hours and remained fully supervised. The majority of the time, visits could not be held at Tracy's home due to its continuing filthy condition.

Adding to Tracy's difficulties in caring for herself is the fact that Ashe is a child with his own advanced needs. He continues to struggle with behaviors and needs structure and routine to continue making improvements. Ashe's foster mother is a social worker and mental health practitioner. She testified as to how important consistency and routine are for Ashe. She stated

that Ashe's current behavior is pretty typical behavior of a child his age and that as long as Ashe's foster parents respond with structure, routine, and predictability, he does well. When asked if she has any present concerns for Ashe, his foster mother testified that she worries about maintaining consistency for him.

Ledesma opined that terminating Tracy's parental rights would be in Ashe's best interests and outlined the reasons for her opinion. As of the date of the termination hearing, Ashe had been out of Tracy's home for over 2 years, and Ledesma testified that she did not see any possibility of placement with Tracy anytime in the near future.

Several other witnesses also indicated that they did not believe Tracy could provide for Ashe's needs. A visitation supervisor stated that she did not believe that Tracy could meet Ashe's needs on her own on a full-time basis, and Reece testified that from what he knows of Tracy and her parenting, he did not believe she could provide the support that Ashe needs. While we acknowledge that the focus is on Ashe's best interests, we also note Tracy's own guardian ad litem testified that at the time of the hearing, she did not think it would be in Tracy's best interests to have Ashe returned to Tracy, and that it would be in Tracy's best interests that Tracy's guardian ad litem support terminating Tracy's parental rights.

When a natural parent suffers from a mental deficiency and cannot be rehabilitated within a reasonable period of time, the best interests of the children require that a final disposition be made without delay. *In re Interest of Marcus W. et al.*, 11 Neb. App. 313, 649 N.W.2d 899 (2002). We conclude that Ashe's best interests require termination of Tracy's parental rights.

CONCLUSION

For the reasons stated above, we affirm the juvenile court's order terminating Tracy's parental rights to Ashe.

AFFIRMED.