IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF ERIKA M.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF ERIKA M., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

ROBERT P., APPELLANT.

Filed April 26, 2022.    No. A-21-817.

Appeal from the County Court for Box Butte County: PAUL G. WESS, Judge. Affirmed.

Andrew M. Pope, of Crites, Shaffer, Connealy, Watson, Patras & Watson, P.C., L.L.O., for appellant.

Marissa L. Curtiss, Deputy Box Butte County Attorney, for appellee State of Nebraska.

Audrey M. Long, of A. Elliott Law, P.C., L.L.O., guardian ad litem.

MOORE, RIEDMANN, and ARTERBURN, Judges.

ARTERBURN, Judge.

INTRODUCTION

Robert P. appeals from the order of the county court for Box Butte County, sitting as a juvenile court, which terminated his parental rights to his child, Erika M. On appeal, Robert challenges the court's finding that termination of his parental rights was warranted pursuant to Neb. Rev. Stat. § 43-292(5) (Reissue 2016) and that termination was in Erika's best interests. Based on the reasons that follow, we affirm.

- 1 -

BACKGROUND

Erika, born in February 2020, is the biological child of Robert and Veronica M. Although the State sought to terminate both Veronica's and Robert's parental rights to Erika at the same time, Veronica ultimately relinquished her parental rights in April 2021. As such, Veronica is not a party to this appeal and her involvement in the case will be discussed only to the extent necessary to provide context.

Erika has five biological siblings older than her. Robert and Veronica's parental rights to four of those siblings were terminated in 2018. As part of a separate juvenile proceeding, Veronica relinquished her rights to the fifth sibling in 2020. Robert's parental rights to that child were also terminated in 2020. Although the present appeal only concerns the appeal from the termination of Robert's parental rights to Erika, we discuss these prior cases briefly to provide context to the present appeal.

On August 31, 2018, the county court for Garden County, sitting as a juvenile court, entered an order terminating Robert and Veronica's parental rights to their four oldest children. The court found that statutory grounds to terminate Robert's and Veronica's parental rights existed pursuant to § 43-292(2), (3), (5), (6), and (7) and that termination was in the children's best interests. This court affirmed the termination of parental rights as to these four children. See *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 933 N.W.2d 873 (2019).

Evidence adduced at the 2018 termination trial revealed that Robert did not cooperate with caseworkers for the Nebraska Department of Health and Human Services (the Department). He did not sign a release to allow an evaluation of the children. He did not allow caseworkers into the family home when they were attempting to assess the safety of the home. In addition, Robert would either not listen to caseworkers after being redirected or would argue and express anger with caseworkers. He made accusations against the foster parents and family support workers. In at least one incident, he threatened the life of one caseworker and asserted that he knew where the caseworker lived and what school and daycare her children attended. Ultimately, the caseworker obtained a protection order against Robert.

There was also evidence adduced at the 2018 termination hearing that Robert and Veronica did not properly tend to the children's medical needs. They did not take the children to the doctor and three of four children had not been given any immunizations. When the children were removed from Robert and Veronica's care, some of the children were diagnosed with serious infections and dehydration. The children were found to be behind age appropriate developmental milestones. The children exhibited notable speech delays and communicated with each other through use of their own language. On August 6, 2019, we affirmed the decision of the county court which terminated Robert and Veronica's parental rights to the four siblings.

Erika's fifth sibling, Brittney Sue P., was born in December 2017, prior to the termination trial regarding the four older siblings. Proceedings for termination of Robert and Veronica's parental rights to Brittney Sue were initiated in September 2019. Veronica voluntarily relinquished her parental rights to Brittney Sue. In April 2020, the county court for Garden County terminated Robert's parental rights to Brittney Sue finding that statutory grounds existed pursuant to § 43-292(2), (6), and (7) and that termination was in Brittney Sue's best interests. See *In re Interest of Brittney Sue P.*, A-20-369, 2020 WL 6735786 (Nov. 17, 2020) (selected for posting to court

website). As pertinent to the present appeal, evidence adduced at the termination trial demonstrated continuing concerns regarding Robert's mental health, his inability to participate in programming, his agitation with respect to working with caseworkers, and his continuing failure to attend to the medical needs of his daughter or provide her with a safe environment in which to live. Ultimately, this court affirmed the decision to terminate Robert's parental rights to Brittney Sue on November 17, 2020.

In the present case, Erika was removed from her parents' care immediately after her birth. The State filed a petition on February 14, 2020, alleging that Erika was a juvenile within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) due to the faults or habits of her parents. Among other allegations, the State asserted that Erika was at risk for harm because Robert and Veronica had their parental rights terminated as to their older children. The State requested that the court place Erika in the care and custody of the Department. The county court entered an ex parte order that day finding that probable cause existed that Erika was a juvenile within the jurisdiction of the court. The court placed Erika in the care and custody of the Department where she has remained throughout the duration of the juvenile court proceedings.

On October 5, 2020, the State filed an amended petition which again asserted that Erika was a child within the meaning of § 43-247(3)(a). The State again asserted that Erika was at risk for harm because Robert and Veronica's parental rights were terminated with respect to their four oldest children in 2018. The amended petition included information about the termination of Robert and Veronica's parental rights as to Brittney Sue. Robert ultimately entered a plea of denial to the allegations contained in the amended petition.

On December 4, 2020, the State filed a motion to terminate Robert and Veronica's parental to Erika. The motion alleged that termination was warranted pursuant to § 43-292(2), (5), and (6). Specifically, with respect to subsection (2), the State alleged that Robert and Veronica had substantially and continually or repeatedly neglected and refused to give Erika, or one of her siblings, necessary parental care and protection because Robert and Veronica's parental rights were terminated with respect to Erika's five biological siblings. With respect to subsection (5), the State alleged that Robert and Veronica were unable to discharge their parental responsibilities because they had been diagnosed with mental deficiency, mental illness, and personality disorders which were expected to continue for a prolonged period of time. With respect to subsection (6), the State alleged that reasonable efforts to preserve and reunify the family had failed to correct the conditions leading to the determination that Erika was a juvenile as defined under § 43-247(3)(a). The State also alleged it was in Erika's best interests for Robert and Veronica's parental rights to be terminated.

On April 29, 2021, Veronica relinquished her parental rights to Erika which was accepted by the court. Trial was held on the motion for termination of Robert's parental rights on July 12, 2021. The following evidence was presented at trial.

Dr. Gage Stermensky, a clinical psychologist and chief strategy officer at the Community Action Health Center, completed a comprehensive parental capacity evaluation for Robert in 2017, in the context of the juvenile proceedings involving Erika's four oldest siblings. Stermensky testified that he was initially asked to assess Robert because there were concerns about Robert's ability to parent his children and about Robert's propensity for violent behavior.

Stermensky diagnosed Robert as suffering from paranoid personality disorder with narcissistic traits. In addition, Stermensky noted that Robert experiences childhood abandonment and parent-child relation issues. Stermensky explained that, generally, those who suffer from paranoid personality disorder display a distrust of various "systems," which he classified as therapists and workers with the Department, and struggle to cooperate with others. Stermensky observed that Robert, specifically, displayed strong feelings of suspicion and cynicism which led him to hold long-term resentment and to believe other people have negative motives in their treatment of him. Because Robert retains feelings of resentment for long periods, he can appear threatening. Stermensky observed that Robert was unable to cooperate with others, including medical and mental health professionals, and other people potentially involved in the juvenile court proceedings.

In his report, Stermensky noted that Robert actively impeded assessments and services that were supposed to take place to ensure the safety and well-being of his children. He also noted that Robert made threats of causing bodily harm and/or death to at least two individuals involved with the Department's investigation. According to Stermensky, Robert presented "with a long-term, engrained, fixed pattern of distrust and suspiciousness of others resulting in interpreting their actions as malevolent, across settings and contexts." Stermensky observed that Robert viewed offers for assistance as criticism and struggled with authority and following direction.

Stermensky explained that Robert would need to pursue treatment for his paranoid personality disorder and that successful treatment would take an extended period of time. His recommendations in 2017 included Robert participating in ongoing therapy focused on gaining prosocial beliefs, reducing impulsivity and paranoid symptoms, building better insight to relationships, gaining coping skills, and gaining an attachment to his children. He further noted that Robert needed to complete anger management, parenting programs, and family therapy with his children. He stated this process would be long given Robert's issues and could require a medical component.

In his testimony in the present trial, Stermensky acknowledged that he had not seen Robert since his initial evaluation. He noted that Robert's prognosis could change depending on how he was presenting and what types of treatment efforts he had completed. In terms of determining whether Robert had been successfully treated, Stermensky would look for signs that Robert was able to effectively collaborate with others, was no longer holding on to resentment, and was no longer feeling like "others are out to get him."

Joan Schwan, the executive clinical director of St. Francis Ministries, worked with Robert beginning in June 2018. At that time, St. Francis Ministries received a referral for Robert for intensive family preservation services in order to keep Brittney Sue in the home. Robert worked with providers from St. Francis for four hours per week for 12 weeks. Schwan testified that when St. Francis worked with Robert and Veronica in 2018, Robert was resistant to taking directions and was not making the same progress that Veronica was making. Schwan characterized Robert as suspicious of the caseworkers. For example, it took Robert a week to sign certain consent forms necessary for the provision of services. In another instance, when the caseworkers attempted to refer Robert to receive federal assistance, he declined believing that the government would then have his "personal identification."

She also testified about safety concerns with respect to Robert's parenting. Caseworkers located loaded guns in Robert's home. The safety mechanisms on the guns were not employed. Schwan explained that one St. Francis provider refused to visit Robert alone, due to concerns for her safety. Schwan explained that there was one incident where Robert burned trash, including plastic and children's diapers, to heat the home. Schwan testified that prior to their removal from the home, there were two instances when two of Robert's children were left inside a hot van.

According to Schwan, the biggest barrier for Robert progressing as a parent was his paranoid personality disorder. Robert informed caseworkers that he did not believe he needed treatment for this disorder. According to Schwan, Robert was referred to medication management; however, he did not attend. Schwan acknowledged that she has not had any contact with Robert since September 2018. However, she did note that Robert did not make any progress toward his treatment goals during her involvement in the case.

Garrick Schick and Samantha Williams, family support workers at the McConaughy Discovery Center, supervised visits between Robert and Erika beginning in November 2020. Two workers were assigned to do supervision due to past incidents that had occurred between Robert and support workers. The visits between Robert and Erika were scheduled to last one hour and occur two times per week. A total of six visits were conducted. Schick explained that the visits were difficult to schedule because they had to coordinate the schedules of Robert, Schick and his co-worker, the foster family, and Veronica. In addition, the visits had to occur at public places. The primary issue with scheduling centered on Robert however. Williams testified that there were difficulties in communicating with Robert and scheduling visits. She explained that initially Schick was communicating with Robert, but that Schick reported "having a lot of struggles with Robert communicating and getting along." Williams testified that there were not consistent days where visitation was occurring. She explained that typically they try to schedule visits on a "week by week" basis but that Robert wanted to provide only two or three hours' notice to schedule a visit, which she explained was simply not feasible. As a result, many visits were missed or canceled.

Schick testified that Robert arrived to the visits well prepared for his visit: Robert would have toys, food, formula, and diapers for Erika. He also would play a music video that Erika seemed to "connect with." Neither Schick nor Williams had any safety concerns during the visits. According to Schick, Robert focused on Erika throughout his visits and would interact with her. Schick observed that Erika would cry throughout the visits which he attributed to Erika not knowing Robert well. Schick also observed that Robert attempted to calm her down, but was not always successful. Williams testified that she contacted the caseworker due to Erika screaming and crying for the duration of the visits. According to Williams, as soon as Erika would see Robert, she would begin to push away from him and cry and scream until she had difficulty breathing. Although Williams observed Robert attempting to comfort Erika, his efforts were generally unsuccessful. Schick and Williams testified that Robert would call Erika "Bellany Sue" sometimes despite being told not to do so.

Schick reported that there was an incident where Robert verbalized his anger toward a male caseworker. According to Schick, Robert said that the male caseworker hit him outside of court and Robert said that it "took all of his self-restraint not to murder him on the spot."

Dennis O'Brien is an initial assessment worker, investigator, and ongoing caseworker with the Department. He has 32 years of service with the Department and had been assigned as one of

Robert's caseworkers since December 2016. He explained that he was initially assigned to investigate Robert following concerns of physical and medical neglect of Robert's children and the physical safety of the prior caseworkers. According to O'Brien, Robert made threats toward the prior caseworkers and their families which resulted in the entry of protection orders against Robert.

In O'Brien's opinion, Robert's behavior and his ability to parent have not changed substantially since O'Brien began working with him. Although O'Brien acknowledged that there have been intermittent periods where improvement was observed, Robert could not sustain any positive changes, ultimately resulting in the loss of parental rights to his older children. He was not willing to follow redirection from support staff, therapists, and remained hostile toward providers. O'Brien explained that Robert continues to follow the same path and remains uncooperative with providers and the Department. O'Brien confirmed that Robert would demand that schedules and other aspects of visitation be changed after initially making an agreement with the Department as to a visitation schedule. He further cited an incident wherein Robert had an altercation with a transportation provider.

O'Brien also testified that the parental capacity evaluation completed by Stermensky included certain recommendations. However, to O'Brien's knowledge, Robert had not followed them. For instance, O'Brien had not received any information that Robert is or has been engaged in ongoing therapeutic treatment or an anger management program. O'Brien opined that Robert "absolutely" cannot safely parent Erika. In his opinion, Erika's best interests require the termination of Robert's parental rights.

Chantelle Reicks, a lead worker for child and family services who is employed by the Department, has also been an assigned caseworker for Robert's children since June 2018. She testified that she does not have any direct interactions with Robert because she only contacts him through his attorney.

After Erika's birth, she attempted to conduct team meetings with Robert present, but could not do so until Robert's paternity was established. Robert was not compliant with the Department's efforts to complete genetic testing for a period of time. This noncompliance also prevented the Department from establishing visitation for Robert. She explained that the team meetings still did not occur after paternity was established because there was not a time that Robert would make himself available. She worked with Robert to establish a schedule for his visits with Erika. She explained that the visits were to be fully supervised, two times per week, in one hour increments. She testified that the visits would increase based on certain factors, including whether Robert had a bond with Erika and whether visits were consistently occurring.

Reicks testified that Robert did not develop a bond with Erika and that visits were not consistent. Robert was not willing to confirm times that he would be available to visit with Erika. Initially, Robert indicated that he wanted the visits to occur in the early morning so that he could get to work after the visits, but once that request was accommodated, Robert refused to confirm the visits in the morning. Instead, he indicated that he could only have visits after five o'clock and on the weekends. However, since the visitation was supposed to occur in community buildings which are not open after five o'clock or on the weekends, finding an appropriate location was difficult. Reicks testified that during visitation, Robert would spend some of his time focusing on

factors outside of bonding with Erika. She noted that Robert would speak poorly of the foster parents for his other children, speak negatively about the Department, and focus on Veronica.

Reicks also expressed her concern about Robert's behavior, noting his history of being verbally aggressive toward providers. She emailed reports of concerns from Erika's foster parents after Erika was returned to their home after visits and from a transportation provider. Reicks explained that there was an altercation between Robert and the driver. Reicks explained that because of this altercation, the transportation provider would no longer provide Robert with transportation.

Although Reicks acknowledged that Robert acted appropriately with Erika during his visits, she did not believe that Robert had made sustained progress toward becoming an appropriate parent because he continued to exhibit the same behaviors he did in 2018. She opined that Robert's parental rights should be terminated.

Jose Pruneda and his wife have been the foster parents for Erika since shortly after her birth. He described Erika as a strong child who is determined to do her own thing. However, he also explained that she is a very happy baby. In Pruneda's opinion, Erika is hesitant with strangers but usually does not take more than a couple of visits for her to build her trust. Pruneda recalled that when he dropped off Erika with Robert, Erika cried and acted as if she was scared. He explained that this behavior continued with each visit and did not improve. He testified that while waiting outside the visitation room, he heard Erika cry throughout an entire visit after which she fell asleep. Based on his knowledge, he believed that Erika cried every time she was with Robert.

On September 10, 2021, the county court entered an order terminating Robert's parental rights pursuant to § 43-292(5). However, the court denied the motion to terminate with respect to § 43-292(2) and (6). The court explained that the evidence adduced at trial showed that Robert was diagnosed with paranoid personality disorder with narcissistic personality traits that hindered his ability to collaborate or cooperate with others. The court noted that in the prior cases with Erika's older siblings, Robert did not seek treatment for his mental illness which resulted in no progress being made toward reunification. This ultimately led to the termination of his parental rights to Erika's older siblings.

The court determined that, in the present case, Robert still refused to seek any treatment, although he continues to "labor" under his mental illness. The court noted that although Robert behaved like a proper parent during the few supervised visits which had occurred, such good behavior was "entirely overshadowed by his overt hostility toward addressing his mental illness [and] cooperating with [the Department's] workers." Accordingly, the court found that Robert's mental illness continues to render him unable to perform parental responsibilities.

The court concluded:

The evidence is clear and convincing that Robert is unable to discharge his parental responsibilities because of his mental illness. Moreover, it is reasonable to believe that Robert's mental illness/inability to parent will continue for a prolonged indeterminate period. First, the basis for the termination of Robert's parental rights to Erika's siblings; the child neglect, and Robert's failure to correct the conditions leading to the determination that Erika's siblings were within § 43-247(3)(a); was a result, at least in part, of Robert's mental illness. We know that Robert has labored under his mental illness since at least 2017 when he was evaluated and diagnosed with a paranoid personality disorder and narcissistic

personality traits. The prior termination, then, is a predicate to the State's theory for termination in this case, that Robert's mental illness has been prolonged and continues to render him unable to be a fit and proper parent. Second, Robert has no better ability to parent today than he had when his parental rights were previously terminated. Finally, because Robert has yet to do anything to address his mental illness, and there is no indication whatsoever that he has any interest in addressing his mental illness, his inability to parent will continue for an indeterminate period.

The court further concluded that terminating Robert's parental rights was in Erika's best interests:

The evidence is clear and convincing that termination of Robert's parental rights is in Erika's best interests. Robert is not fit to parent Erika. Parental unfitness means a personal deficiency that has prevented, or will likely prevent, performance of a reasonable parental obligation in raising a child that has caused or will probably result in a detriment to a child's well-being. *In re Interest of Nicole M.*, 287 Neb. 685[, 844 N.W.2d 65 (2014)]. Robert's mental illness led to termination of Erika's siblings. Robert's mental illness remains unaddressed and unabated and therefore will likely continue to prevent him from being a fit and proper parent for Erika. Aside from that, Erika has virtually no relationship with Robert. Erika is thriving in her foster home placement, where she has been all of her life. Erika has a secure attachment to her foster family and is able to maintain a bond with her siblings. Erika's best interests require terminating Robert's parental rights.

Robert appeals from the county court's order terminating his parental rights to Erika.

## ASSIGNMENTS OF ERROR

On appeal, Robert alleges that the county court erred in finding that there was sufficient evidence presented at the termination trial to prove (1) the relevant statutory grounds for termination of his parental rights and (2) that termination of his parental rights is in Erika's best interests.

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d 255 (2012).

## ANALYSIS

For a juvenile court to terminate parental rights under § 43-292, it must find that one or more of the statutory grounds listed in this section have been satisfied and that such termination is in the child's best interests. *In re Interest of Xavier H.*, 274 Neb. 331, 740 N.W.2d 13 (2007). The State must prove these facts by clear and convincing evidence. *Id.*

*Statutory Factors.*

Robert asserts that the court erred in terminating his parental rights pursuant to § 43-292(5). Upon our de novo review, we find that the evidence clearly and convincingly demonstrates that

Robert is unable to discharge his parental responsibilities because of a mental illness or mental deficiency and there are reasonable grounds to believe that his condition will continue for a prolonged and indeterminate period.

Mental illnesses and deficiencies that prevent a parent from performing daily tasks and routine parental duties are grounds for termination of parental rights under § 43-292(5). See *In re Interest of Marcus W. et al.*, 11 Neb. App. 313, 649 N.W.2d 899 (2002) (holding that mother who had frontal lobe impairment, generalized anxiety disorder, and mood disorder and who would need assistance for daily living activities, met statutory ground under subsection (5)). See also *In re Interest of C.A.A. and V.S.A.*, 229 Neb. 135, 425 N.W.2d 621 (1988). The plain language of § 43-292(5) indicates that the mental illness or mental deficiency must only render a parent unable to discharge his or her parental responsibilities, it does not have to render the parent completely incompetent. See *In re Interest of Holley*, 209 Neb. 437, 308 N.W.2d 341 (1981). The Nebraska Supreme Court has held that personality disorders which prevent a parent from profiting from instruction and acquiring parenting skills is a sufficient mental deficiency under § 43-292(5). See *In re Interest of Natasha H. & Sierra H.*, 258 Neb. 131, 602 N.W.2d 439 (1999).

In the present case, the record reveals that Robert was diagnosed with paranoid personality disorder with narcissistic traits in 2017. According to Stermensky, this disorder makes it difficult for Robert to trust and cooperate with others. Stermensky observed that Robert would display suspiciousness and cynicism resulting from him interpreting others' actions as malevolent. In addition, Robert views offers for assistance as criticism. The testimony demonstrated that Robert needs to pursue treatment for this disorder and that successful treatment will take a long period of time. For a change in the diagnosis, there would need to be a demonstration that Robert could effectively cooperate with others and not harbor long term resentment.

The State presented clear and convincing evidence that while his older children were in his care, Robert was unable to appropriately discharge his duties as a parent. Robert suffers from a mental disorder first diagnosed in 2017 which appears to still be adversely affecting him. Throughout the prior proceedings and this case Robert has failed to provide caseworkers any evidence that he has, on a sustained basis, followed Stermensky's recommendations to pursue treatment. The evidence at trial demonstrated that Robert continues to struggle to cooperate with others and continues to display suspiciousness and at times, animosity with respect to others' actions. Robert would not communicate with the caseworkers except through his attorney. The testimony also revealed that Robert did not work with caseworkers and family support workers to have a consistent visitation schedule, even when the consistency could result in more visits with Erika.

Robert continued to harbor resentment against others. He threatened a male caseworker and had an altercation with a transportation provider. Caseworkers who had worked with Robert during all of the juvenile court proceedings involving his children reported that Robert's current actions were consistent to the actions that he displayed in the past. Essentially, the caseworkers observed no real improvements in Robert's circumstances or disposition. Therefore, we agree with the county court that clear and convincing evidence was provided demonstrating that Robert is unable to discharge his parental responsibilities because of mental illness or mental deficiency and that the condition will continue for a prolonged indeterminate period.

*Best Interests.*

Under § 43-292, once the State shows that statutory grounds for termination of parental rights exist, the State must show that termination is in the best interests of the child. *In re Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d 255 (2012). A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must also show that the parent is unfit. *In re Interest of Nicole M.*, 287 Neb. 685, 844 N.W.2d 65 (2014).

There is a rebuttable presumption that the best interests of a child are served by having a relationship with his or her parent. *Id.* Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that a parent is unfit. *Id.* The term "unfitness" is not expressly used in § 43-292, but the concept is generally encompassed by the fault and neglect subsections of that statute and also through a determination of the children's best interests. *In re Interest of Nicole M., supra.* Parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's wellbeing. *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020). The best interests analysis and the parental fitness analysis are separate inquiries but each examines essentially the same underlying facts as the other. *Id.*

One's history as a parent speaks to one's future as a parent. *In re Interest of Sir Messiah T. et al.*, 279 Neb. 900, 782 N.W.2d 320 (2010). However, one's history does not alone determine his or her future. *In re Interest of Seth K. & Dinah K.*, 22 Neb. App. 349, 853 N.W.2d 217 (2014). The law does not require perfection of a parent; instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child. *Id.*

We first note that Robert's parenting history resulted in the termination of his parental rights to all five of his older children. The previous juvenile court proceedings involving Brittney Sue concluded in 2020 after the present case commenced. During the previous juvenile court proceedings, there was significant evidence adduced as to the deficiencies in Robert's parenting including safety concerns, medical neglect, and an inability to cooperate with others. Robert threatened the lives and families of at least two people involved in the prior cases who were attempting to help him.

There was no evidence presented during the current proceedings which suggested that Robert has done anything to improve his mental health, improve his parenting skills, or curb his emotions. To the contrary, caseworkers who have worked with Robert both during the prior proceedings and during these proceedings, testified that they have seen no improvements. These witnesses point to the fact that Robert continues to struggle with cooperating with others and with communicating appropriately with caseworkers and other providers. He has also continued to struggle to listen and follow through with redirection from family support workers. In addition, Robert has threatened a caseworker and had an altercation with another provider.

Although Robert arrived to the visits prepared, Robert then utilized a portion of his time with Erika to speak negatively about foster parents and the caseworkers. Additionally, Robert's visits could not be increased due to his lack of consistency in scheduling visits. After initially requesting that visits occur early in the morning, he refused to consistently confirm these visits

once the caseworkers scheduled them. Rather than settling on a schedule, Robert attempted to schedule visits with only a few hours' notice to visitation workers.

Considering the significant deficiencies in Robert's past parenting efforts, his mental health condition that has remained untreated, and the fact that he has not demonstrated that he has made any improvements to his ability to parent, we find the State has rebutted the presumption that preservation of the parent-child relationship between Robert and Erika is in her best interests. We agree with the county court that Robert's parental rights should be terminated.

CONCLUSION

Based on our de novo review of the record, we conclude that the State sufficiently proved a statutory ground for termination of Robert's parental rights to Erika and proved that termination is in her best interests. We, therefore, affirm the termination of Robert's parental rights.

AFFIRMED.